1

2

3

4   SULLIVAN HILL REZ & ENGEL                    **Electronically Filed:** 02/27/2020
    A Professional Law Corporation
5   James P. Hill, SBN 90478
    Gary B. Rudolph, SBN 101921
6   Kathleen A. Cashman-Kramer, SBN 128861
    600 B Street, Suite 1700
7   San Diego, California 92101
    Telephone: (619) 233-4100
8   Fax Number: (619) 231-4372

9   Attorneys for Plaintiff, Ronald E. Stadtmueller, Chapter 7 Trustee

10              **UNITED STATES BANKRUPTCY COURT**
                **SOUTHERN DISTRICT OF CALIFORNIA**
11
    In re                            )   CASE NO. 19-04688-CL7
12                                   )
    INTEGRATEDMARKETING.COM          )   Chapter 7
13  , dba RONI HICKS &               )
    ASSOCIATES,                      )   Adv. Pro. No.
14                                   )
                        Debtor.      )   **COMPLAINT FOR TURNOVER OF**
15  RONALD E. STADTMUELLER,          )   **PROPERTY OF THE ESTATE,**
    Chapter 7 Trustee                )   **DECLARATORY RELIEF**
16                                   )   **[VIOLATION OF THE AUTOMATIC**
                        Plaintiff,   )   **STAY], ACCOUNTING, RECOVERY**
17  v.                               )   **OF TRANSFERS, AND OBJECTIONS**
                                     )   **TO CLAIMS**
18  MIGUEL PAREDES; PRUDENT          )
    FIDUCIARY SERVICES LLC,          )
19                                   )   Dept.:5
                        Defendant.   )        Hon. Christopher B. Latham
20

21         Comes now Plaintiff Ronald E. Stadtmueller ("Plaintiff" or "Trustee"), the

22  Chapter 7 Trustee of the bankruptcy estate ("Estate") of IntegratedMarketing.com dba

23  Roni Hicks & Associates ("Debtor"), and alleges as follows:

24                                   **I.**

25                                 **PARTIES**

26         1.     On August 2, 2019 ("Petition Date"), the Debtor filed a voluntary

27  petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy

28

    409392-v1                          - 1 -

1  Code")[1] in the U.S. Bankruptcy Court for the Southern District of California

2  ("Court"), initiating the Chapter 11 case entitled In re IntegratedMarketing.com dba

3  Roni Hicks & Associates, Case No. 19-04688-LA7 ("Bankruptcy Case"). Thereafter,

4  on November 4, 2019 the case was converted to Chapter 7, and Ronald E.

5  Stadtmueller was appointed Chapter 7 Trustee of the Estate.

6        2.     Plaintiff is informed and believes and thereon alleges that defendant

7  Miguel Paredes is an individual resident of the state of California, and also a principal

8  of Defendant Prudent Fiduciary Services LLC.

9        3.     Plaintiff is informed and believes and thereon alleges that Prudent

10  Fiduciary Services LLC is a limited liability company formed under, and operating

11  under, the laws of the state of California.

12  JURISDICTION

13        4.     This Court has jurisdiction over the parties and subject matter of this

14  proceeding pursuant to 28 U.S.C. §§ 157 and 1334, as well as General Order 312-E of

15  the U.S. District Court for the Southern District of California. This action is

16  commenced pursuant to 11 U.S.C. Sections 362, 502(d), 541, 542, 550 and 551, and

17  Rules 3007(b), 7001(1), 7001(7), and 7065 of the Federal Rules of Bankruptcy

18  Procedure ("FRBP").

19        5.     This Court may hear and determine this proceeding and enter appropriate

20  orders and judgments pursuant to 28 U.S.C. § 157(b)(1) and (2). This proceeding

21  relates to the underlying Bankruptcy Case and is a core proceeding as set forth in 28

22  U.S.C. §§ 157(b)(1) and (2)(A), (B), (E), and (O), in that it seeks to enjoin a

23  transaction that is alleged to violate the automatic stay, and to obtain turnover of

24  property of the estate that is or shall be paid to the Defendants as part of the

25  transaction, which claims affect the administration and liquidation of assets of the

26  Estate.

27

28  [1] Unless otherwise indicated, all "Chapter" and "Section" references are to the Bankruptcy Code and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

6.     Pursuant to FRBP Rule 7008, Plaintiff hereby consents to the entry of final orders or judgment by the Court.  Additionally, pursuant to Local Bankruptcy Rule 7008-1, if the Court determines this proceeding is a core proceeding, Plaintiff hereby consents to the entry of final orders or judgment by the Court.

## STATEMENT OF FACTS

7.     By way of background, the Trustee is informed and believes and thereon alleges that the Debtor/ Company was founded in 1979 by Roni Hicks Clemens as a public relations and advertising agency serving a wide range of industries including real estate. In 1999, the Company was sold to Jane Carey Wheeler ("Ms. Wheeler") and Diane L. Gaynor McCue ("Ms. McCue") who then incorporated the Company as Integratedmarketing.com dba Roni Hicks & Associates and the Company has specialized in real estate community planning, marketing and public affairs.

8.     The Trustee is informed and believes and thereon alleges that, when Ms. Wheeler, her husband Stephen Wheeler, Ms. McCue, and her husband Steven McCue (collectively the "Sellers"),  decided to retire, they structured a two stage sale of their shares in the Company to their employees, many of whom had been with the company for more than 10 years, and the first stage of this process occurred in 2014.

9.     Plaintiff is informed and believes and thereon alleges that In March 2014 the Sellers owned all of the issued and outstanding shares of the common stock of the Debtor. The first stage of the ESOP Transaction was set forth in the Stock Purchase Agreement dated March 13, 2014 ("First SPA") pursuant to which the Sellers sold 49,000 shares of the common stock to the Trust for the purchase price of $5,350,000.00 which is approximately $109.18 per share. The Wheelers sold 36,750 shares for a purchase price of $4,012,500 and the McCues sold 12,250 shares for a purchase price of $1,337,500.

10.     Pursuant to the Loan and Security Agreement dated March 13, 2014 ("First Acquisition Loan") First American Bank (the "Bank") provided financing in the amount of $5,350,000 for the purchase of the Seller's shares of the common stock

of the Company. As noted above, at the time of the First Acquisition Loan, the Company's Board of Directors was comprised entirely of the Sellers and their family members. All of the Bank's loan documents for the First Acquisition loan which provided financing for the purchase of the stock from the Sellers were executed by Ms. Wheeler as President and/or as the Chief Financial Officer of the Company. A true and correct copy of the Loan and Security Agreement dated March 13, 2014 is attached as Exhibit "A" and incorporated herein by reference.

11.    The loan that the Debtor obtained to pay for these initial shares was all due and payable on March 1, 2019. In addition, it provided that the Debtor/Company was required "to enter into employment contracts with Jane C. Wheeler and Diane Lori Gaynor-McCue, the terms of which shall in no event be less than the Term Loan Term;" e.g., to March 2910. See section 9.18 [which also stated that the Company was to "provide Bank with the opportunity to review and disallow any other key management employment contracts prior to entering into any such contract." This provision ensured that the Sellers remained in control of the Company for the Second Stage of the ESOP Transaction.

12.    Plaintiff is informed and believes and thereon alleges that, between the time of the 2014 transaction and the 2017 transaction, the Sellers continued to control the Debtor's board of directors. This includes, but is not limited to, making all decisions regarding payment of loans owed by the Debtor, the decision to incur new loans on behalf of the Debtor, and the decision to complete the sale of the Wheeler and McCue shares in 2017.

13.    On or about June 30, 2017, the Debtor entered into that certain Stock Purchase Agreement between itself, as the Company, First Bankers Trust Services, Inc. ("First Bankers"), as trustee of the Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust"), Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue, and Steven F. McCue (the Wheeler and the McCues are collectively referred to herein as the "Sellers"). A true and correct copy of this 2017 Stock

Purchase Agreement is attached hereto as Exhibit "B."

14.    According to the Stock Purchase Agreement, the Wheelers held 38,250 shares, and the McCues held 12,750 shares, the value given to the shares was $164.71 per share, and the total purchase price for all shares was to be $8,400,000. Of this amount, the Wheelers were to receive $6,300,000, and the McCues were to receive $2,100,000. See Exhibit "B,", paras 1, 2.

15.    The Stock Purchase Agreement was amended on or about June 21, 2019 to replace First Bankers with defendant Miguel Paredes as the sole trustee of the Trust, and to extend certain deadlines. A true and correct copy of this Amendment is attached hereto as Exhibit "C."

16.    In order to fund the 2017 Stock Purchase by the Debtor, the Debtor was required to and in fact did apply to First American Bank ("First America") for a loan, the proceeds of which would be used to pay to the Sellers the purchase price for the stock under the terms of the Agreement.   Specifically, the Debtor borrowed the sum of $7,500,000 from First American to fund this transaction.

17.    Plaintiff is informed and believes and thereon alleges that, while the Debtor was required to obtain the loan to purchase the shares, the shares of stock purchased from the Sellers would then be in the name of the Trust, rather than in the name of the Debtor.

18.    Plaintiff is informed and believes, and thereon alleges, that the beneficiaries of the Trust were other employees of the Debtor as of the date of the Stock Purchase Agreement.

19.    The Stock Purchase Agreement also provided that the Debtor would lend to the Trust the sum of $6,448,978.00, from which the Trust would pay the obligations to the Sellers under the terms of the Stock Purchase Agreement. See para. 4.(c) of Exhibit "B." Plaintiff is informed and believes and thereon alleges that a separate agreement was prepared and signed which documented this loan. A true and correct copy of the ESOP Loan Agreement is attached hereto as Exhibit "D."

20.    Plaintiff is informed and believes and thereon alleges that the Stock Purchase sale closed on or about June 30, 2017, at which time the following payments were made from the Trust, from the proceeds of the First American loan directly to the Sellers, as follows: the sum of $4,836,733.50 to the Wheelers, and the sum of $1,612,244.50 to the McCues.

21.    Plaintiff is informed and believes and thereon alleges that commencing in March 2019, the Debtor gave notice to the Sellers that it appeared that the purchase price set by the valuation commissioned for the Stock Purchase had over-valued the Debtor's stock by a significant amount.

22.    The Plaintiff is informed and believes and thereon alleges that the Sellers, the Bank, the Trust and Prairie [the appraiser] knew, or should have known before the 2017 sale closed, that the stock price was too high, meaning the acquisition loan from the Bank was too high and the Debtor Company would be unable to sustain payments on that loan and/or remain within the stated debt ratio. On September 30, 2019 counsel for the Debtor sent a letter to counsel for the Sellers detailing, among other things, the knowledge the Sellers had about the impending loss of the Company's key client before the 2017 SPA, and numerous claims that Sellers breached warranties provided and numerated in section 6.5(a) and (b) and 6.6 of the Stock Purchase Agreement.  See Exhibit "E."

23.    The Plaintiff is informed and believes, and thereon alleges, that the Debtor has claims against the Sellers, First Bankers, and certain other third party claims.

24.    Also on September 30, 2019, Defendant Paredes, the successor trustee of the ESOP Trust, sent a letter to the Sellers and their counsel, in which he alleges breaches by the Sellers of certain provisions of the 2017 Stock Purchase Agreement. A true and correct copy of this letter is attached hereto as Exhibit "F."  Among other things, he stated that certain information was not appropriately and/or sufficiently disclosed by the Sellers to the predecessor trustee of the ESOP, and that information

1  was known or knowable to the Sellers at the time of the sale.  His letter then goes on

2  to state that "such information concerned a material adverse change in the financial

3  condition and prospects of the [Debtor] . . ." which "resulted in the ESOP paying more

4  than fair market value for the stock.  This loss to the ESOP has been calculated by Mr.

5  Paredes to be between $4,236,000 and $4,447,000."

6        25.    On February 19, 2020 Paredes caused to be filed two proof of claim in

7  this case: claim no. 52 in the amount of $28,401.69, for payment of fees and expenses

8  related to the administration of the ESOP Trust, and claim no. 53 in the amount of

9  $4,447,000, which amount represents what he believes to be the overpayment that was

10  made for the value of the Seller's shares of stock.

11        26.    Meanwhile, Plaintiff is informed and believes that, despite  Paredes'

12  demand to the Sellers contained in his September 30, 2019 for up to $4,447,000,

13  Paredes and Prudent entered into an agreement with the Sellers, containing releases of

14  claims, whereby the Sellers would only be required to pay to the ESOP Trust the sum

15  of $60,000 (the "Settlement Funds").

16        27.    Plaintiff is informed and believes and thereon alleges that any and all

17  claims against the Sellers, including, without limitation, any actions for breach of

18  fiduciary duty against officers, directors, and shareholders of the Debtor, are property

19  of the bankruptcy estate.   In turn, the proceeds from such claims, including the

20  Settlement Funds, are also property of the bankruptcy estate.

21        28.    Plaintiff is further informed and believes, and thereon alleges, that

22  Paredes and Prudent intend to use the Settlement Funds  to make payments to the

23  Trust participants, who are former employees of the Debtor, and who are shareholders

24  of the Debtor.  As a result of their shareholder status, they are the lowest in priority for

25  payments on their claims, after all other creditors have been paid in full, under 11

26  U.S.C. section 726.

27        29.    Plaintiff is further informed and believes and thereon alleges that a debtor

28  in bankruptcy, that is truly insolvent, is not liable to an ESOP Trust, which has no

claim against the Debtor as an equity security holder.

## FIRST CLAIM FOR RELIEF

(For Turnover of Estate Property - 11 U.S.C. §§ 363, 522, 541(a)(1), 542(a))

30.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 29, inclusive, as though fully set forth herein.

31.    Plaintiff is informed and believes and thereon alleges that Defendants, or either of them, has possession, custody, or control of the Settlement Funds which the Sellers paid to the Defendants.

32.    Plaintiff asserts that those Settlement Funds are property of this estate under 11 U.S.C. §§ 363(b)(1) and 541(a)(1), that Plaintiff, as Chapter 7 Trustee, may use.

33.    The amount of the settlement which the Defendants, and either of them, received from the Sellers, are of consequential value and benefit to the Bankruptcy Estate.

34.    Pursuant to 11 U.S.C. § 542(a), Defendants, or either of them, are obligated forthwith to turn over to Plaintiff the amount of the settlement funds that they have or will receive from the Sellers.

35.    By reason of the foregoing, Plaintiff seeks an order requiring Defendants, or either of them, to make immediate turnover of the settlement funds that they, or either of them, have received from the Sellers, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

(For Declaratory Relief that Defendants Violated the Automatic Stay– 28 U.S.C. §§ 2201 and 2202, 11 U.S.C. §§ 105(a) and 362(a)(3))

36.     Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 35, inclusive, as though fully set forth herein.

37.    Plaintiff has made demand upon Defendants, or either of them, to turn over to the Plaintiff any and all funds they, or either of them, receives or will receive from the Sellers, including without limitation, the Settlement Funds.  As of the date of

409392-v1                                    - 8 -

1  this complaint, Defendants have refused and failed to turn over those funds to
2  Plaintiff.

3      38.    Plaintiff is informed and believes and thereon alleges that an actual
4  controversy has arisen and now exists between Plaintiff and Defendants, in that
5  Plaintiff contends, and Plaintiff is informed and believes that Defendant denies, that
6  Defendant's failure or refusal to turn over to Plaintiff the settlement funds they, or
7  either of them, have received from the Sellers, is an act to obtain possession of
8  property of the Bankruptcy Estate or of property from the Bankruptcy Estate or to
9  exercise control over property of the Bankruptcy Estate.

10     39.    Plaintiff is informed and believes and thereon alleges that an actual
11 controversy has arisen and now exists between Plaintiff and Defendants, or either of
12 them, in that Plaintiff contends, and Plaintiff is informed and believes that Defendants
13 deny, that by engaging in the conduct described above, Defendants are in violation of
14 the automatic stay, pursuant to 11 U.S.C. § 362(a)(3).

15     40.    Plaintiff desires a judicial declaration declaring that by failing or refusing
16 to turn over to Plaintiff the settlement cash surrender values of the Policies in excess
17 of the Debtors' exemptions therein, Defendant is in violation of the automatic stay,
18 pursuant to 11 U.S.C. § 362(a)(3).

19     41.    Such a declaration is necessary and appropriate at this time for the proper
20 administration of the Bankruptcy Estate, including but not limited to the collection of
21 estate property for the benefit of the Bankruptcy Estate and its creditors.

22     42.    Pursuant to 11 U.S.C. §105(a), Plaintiff further seeks an order requiring
23 Defendant to relinquish possession and control over the settlement funds received by
24 the defendants, or either of them, in an amount subject to proof at trial.

25 / / /
26 / / /
27 / / /
28 / / /

409392-v1                                -9-

## THIRD CLAIM FOR RELIEF

### (Accounting)

43.     Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 42, as though fully set forth herein.

44.     To the extent that the Defendants, or either of them, have already received funds from the Sellers and/or others on behalf of the Sellers, which funds are property of the Bankruptcy Estate, and the Defendants, or either of them, have paid any or all of those funds out to third persons, then the Plaintiff requests a full and complete accounting from the Defendants.

## FOURTH CLAIM FOR RELIEF

### (Permanent Injunction - Fed. Rule Bankr. P. 7065)

45.     Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 44, inclusive, as though fully set forth herein.

46.     Plaintiff is informed and believes and thereon alleges that, from and after the petition date, and continuing to the present time, Defendant, or either of them, have wrongfully and unlawfully made transfers or subsequent transfers of the debtor's interest in property.  Defendants' wrongful conduct, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to plaintiff as plaintiff will be required to institute a multitude of actions to recover such wrongful transfers or distributions and/or Plaintiff may be unable to recover such transfers or distributions from some of the defendants.

47.     Plaintiff has no adequate remedy at law for the injuries suffered and being suffered as it will be difficult or impossible for plaintiff to pursue recovery of such subsequent transfers or distributions from said unknown persons, and he will be required to institute a multiplicity of actions to obtain adequate compensation from other as yet unknown transferees.

/ / /

/ / /

## FIFTH  CLAIM FOR RELIEF

### (Recovery of Transfers – 11 U.S.C. §550(a)(1))

48.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 47, as though fully set forth herein.

49.    Under 11 U.S.C. §550(a), to the extent that a Transfer is avoidable under 11 U.S.C. §548(e) or §549 , Plaintiff is entitled to recover for the benefit of the estate the property transferred, or the value of the property transferred by the Sellers to the Defendants, or either of them.

50.    Plaintiff is entitled to judgment against the defendants under 11 U.S.C. §550(a) and for recovery from them of all Transfers from the Sellers of property of the estate, or their value, together with all proceeds, product, or offspring of the Transfers, or the value thereof, for the benefit of debtor's bankruptcy estate.

## SIXTH CLAIM FOR RELIEF

### (Objection to Claim)

51.    Plaintiff alleges and incorporates by reference paragraphs 1 through 50 of this complaint, inclusive, as though fully set forth herein.

52.    Defendant Prudent filed a proof of claim for $28,401.69 in this case on February 18, 2020 as claim no. 52-1 ("Claim 52").

53.    The Plaintiff objects to the Claim 52 pursuant to Sections 502 and Rule 3007 and Section 502(d), as the Court shall disallow any claim of an entity from which property is recoverable under Section 550 or any claim of a transferee avoidable under Section 549, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under 550.

54.    Until such time as Defendant Prudent repays to the Plaintiff and the Chapter 7 estate the total amount of the avoidable transfers as set forth in this Complaint, Defendant Prudent's Claim 52 must be disallowed.

/ / /

/ / /

409392-v1                                         - 11 -

## SEVENTH CLAIM FOR RELIEF

### (Objection to Claim)

55.     Plaintiff alleges and incorporates by reference paragraphs 1 through 54 of this complaint, inclusive, as though fully set forth herein.

56.     Defendant Paredes filed a proof of claim for $4,447,000.00 in this case on February 18, 2020 as claim no. 53-1 ("Claim 53").

57.     The Plaintiff objects to the Claim 53 pursuant to Sections 502 and Rule 3007 and Section 502(d), as the Court shall disallow any claim of an entity from which property is recoverable under Section 550 or any claim of a transferee avoidable under Section 549, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under 550.

58.     Until such time as Defendant Paredes repays to the Plaintiff and the Chapter 7 estate the total amount of the avoidable transfers as set forth in this Complaint, Defendant Paredes' Claim 53 must be disallowed.

WHEREFORE, Plaintiff prays that the Court enter an Order and Judgment against Defendants, and each of them, and for Plaintiff as follows:

1.     On the First Claim for Relief:

a.     Ordering Defendant to make immediate turnover of the settlement funds that they, or either of them, have received from the Sellers, in an amount to be proven at trial; and

b.     Awarding such other and further relief as this Court may deem just and proper.

2.     On the Second Claim for Relief:

a.     Determining that, by failing or refusing to turn over to Plaintiff the settlement funds from the Sellers that they, or either of them, have received from the Sellers, is an act to obtain possession of property of the Bankruptcy Estate or of property from the Bankruptcy Estate or to exercise control over property of the

Bankruptcy Estate, and is in violation of the automatic stay, pursuant to 11 U.S.C. § 362(a)(3);

     b.     Ordering Defendants, and each of them, to relinquish possession and control over the Settlement Funds by turning over to Plaintiff those funds, in an amount subject to proof at trial; and

     c.     Awarding such other and further relief as this Court may deem just and proper.

     3.     On the Third Claim for Relief:

     a.     For an accounting of any and all funds the Defendants, or either of them, have received from the Sellers, or anyone on their behalf, in connection with settlement of any and all claims related to the 2017 Stock Purchase Agreement;

     b.     For such other and further relief as this Court may deem just and proper.

     4.     On the Fourth Claim for Relief:

     a.     For a temporary, preliminary, and permanent injunction  enjoining and restraining Defendants, or either of them, from exercise any dominion, power and/or control over any property of the estate, including, without limitation, collecting any funds from anyone, and paying out claims to anyone from any and all funds received;

     b.     For such other and further relief as this Court may deem just and proper.

     5.     On the Fifth Claim for Relief:

     a.     For determination that the transfers may be avoided and for recovery from Defendants, or either of them, or any immediate or mediate transferee of Defendants, of property, or the value of such property in the approximate amount of any and all payments received by them from the Sellers, or anyone on their behalf, in connection with settlement of any and all claims related to the 2017 Stock Purchase Agreement, subject to proof at trial together with interest as allowed by law from the date of each transfer.

     b.     For such other and further relief as this Court may deem just and proper.

     6.     On the Sixth Claim for Relief:

1         a.    Disallowance of any and all claims of Defendant Prudent, including the

2    above-defined Claim 52, to the extent that (a) the Court avoids the transfers set forth

3    herein.

4         b.    For such other and further relief as this Court may deem just and proper.

5         7.    On the Seventh Claim for Relief:

6         a.    Disallowance of any and all claims of Defendant Prudent, including the

7    above-defined Claim 53, to the extent that (a) the Court avoids the transfers set forth

8    herein.

9         b.    For such other and further relief as this Court may deem just and proper.

10

11    Dated: February 27, 2020         SULLIVAN HILL REZ & ENGEL
                                 A Professional Law Corporation

12

13                                By:    */s/ Gary B. Rudolph*

14                                      James P. Hill

15                                      Gary B. Rudolph
                                  Kathleen A. Cashman-Kramer

16                                      Attorneys for Plaintiff, Ronald E.
                                  Stadtmueller, Chapter 7 Trustee

17

18

19

20

21

22

23

24

25

26

27

28

409392-v1                        - 14 -

Exhibit Table

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| **A** | Loan and Security Agreement dated March 13, 2014 | 16-41 |
| **B** | 2017 Stock Purchase Agreement | 42-65 |
| **C** | Amendment to Stock Purchase Agreement | 66-70 |
| **D** | ESOP Loan Agreement | 71-92 |
| **E** | Letter dated September 30, 2019 to counsel for the Sellers | 93-102 |
| **F** | Letter dated September 30, 2019 from Prudent Fiduciary Services to the Sellers and their counsel | 103-106 |

# EXHIBIT A

STOCK PURCHASE AGREEMENT

BY AND AMONG

JANE CAREY WHEELER, STEPHEN W. WHEELER, DIANE L.
GAYNOR-McCUE, AND STEVEN F. McCUE, as Sellers,

RONI HICKS & ASSOCIATES, as the Company,

and

FIRST BANKERS TRUST SERVICES, INC., as Trustee

March 13, 2014

# TABLE OF CONTENTS

Page

AGREEMENTS ........................................................................................................... 1

1.    Sale of Stock .................................................................................................... 1

2.    Purchase Price .................................................................................................. 1

3.    Closing ............................................................................................................. 2

4.    ESOP Loan ....................................................................................................... 2

REPRESENTATIONS AND WARRANTIES ............................................................. 2

5.    Disclosure Schedule ........................................................................................ 2

6.    Representations and Warranties of the Sellers ............................................... 2

    6.1    Corporate Organization ....................................................................... 2

    6.2    Articles and By Laws ........................................................................... 2

    6.3    Stock of the Company .......................................................................... 2

    6.4    Subsidiaries .......................................................................................... 3

    6.5    Financial Statements ............................................................................ 3

    6.6    Interim Operations ............................................................................... 3

    6.7    Liabilities ............................................................................................. 4

    6.8    Taxes .................................................................................................... 4

    6.9    Real Property ....................................................................................... 4

    6.10    Other Personal Property ...................................................................... 4

    6.11    Contracts .............................................................................................. 4

    6.12    Licenses ................................................................................................ 5

    6.13    Litigation .............................................................................................. 5

    6.14    Corporate Acts ..................................................................................... 5

    6.15    Retirement Plans .................................................................................. 5

    6.16    Authority .............................................................................................. 5

    6.17    Employee Relations ............................................................................. 5

    6.18    Environmental Matters ........................................................................ 6

    6.19    Licenses, Patents, Trademarks ........................................................... 6

    6.20    Insurance .............................................................................................. 7

    6.21    Pre- and post-Transaction Solvency ................................................... 7

    6.22    Disclosure ............................................................................................ 7

-i-

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 7. | Representations and Warranties of the Trustee | 7 |
| | 7.1 Authority | 7 |
| | 7.2 No Conflicts | 8 |
| | 7.3 Broker's Fees | 8 |
| | 7.4 Accuracy of Representations and Warranties | 8 |

CONDITIONS PRECEDENT TO CLOSING .................................................................. 8

| | | |
|---|---|---|
| 8. | Conditions Precedent to the Obligations of the Trustee | 8 |
| 9. | Conditions Precedent to Obligations of the Sellers | 9 |

DELIVERIES AT CLOSING ........................................................................................... 9

| | | |
|---|---|---|
| 10. | Documents to be Signed and Delivered by the Company and the Trustee at Closing | 9 |
| 11. | Funds to be Delivered by the Company at Closing | 9 |
| 12. | Documents to be Delivered by the Company and the Sellers at Closing | 9 |
| 13. | Funds and Documents to be Delivered by the Trustee at Closing | 10 |

POST-CLOSING MATTERS ........................................................................................... 10

| | | |
|---|---|---|
| 14. | Survival of Representations, Warranties, and Covenants | 10 |
| 15. | Indemnification | 10 |

COVENANTS OF THE COMPANY AND SELLERS ..................................................... 11

| | | |
|---|---|---|
| 16. | Maintenance of Company and Workforce | 11 |
| 17. | Maintenance of the Plan | 11 |
| 18. | Contributions to the Plan | 11 |
| 19. | Tax-Ruling | 11 |
| 20. | Covenant Not to Compete | 12 |
| 21. | Composition of Board of Directors | 12 |
| 22. | Insurance for Principals | 12 |

MISCELLANEOUS .......................................................................................................... 12

| | | |
|---|---|---|
| 23. | Arbitration | 12 |
| 24. | Notice | 12 |
| 25. | Expenses | 13 |
| 26. | Governing Law | 13 |

-ii-

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 27. | Successors and Assigns | 13 |
| 28. | Waivers | 13 |
| 29. | Entire Agreement | 14 |
| 30. | Counterparts | 14 |
| 31. | Action as Trustee | 14 |

## TABLE OF CONTENTS
### (continued)

Page

EXHIBITS
A    -    ESOP Loan Agreement
B    -    ESOP Note
C    -    Stock Pledge Agreement

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement is made and entered into this 13th day of March, 2014 by and among the following parties: Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue, and Steven F. McCue (the "Sellers"); INTEGRATEDMARKETING.COM d/b/a Roni Hicks & Associates, a California corporation (the "Company"); First Bankers Trust Services, Inc. (the "Trustee"), not in its corporate capacity, but solely in its capacity as trustee of Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust"). For purposes of Sections 5, 6, and 20, the term "Sellers" shall mean Jane Carey Wheeler and Diane L. Gaynor-McCue.

### RECITALS

The Company has adopted an employee stock ownership plan known as "Roni Hicks & Associates Employee Stock Ownership Plan" (the "Plan"). In order to implement the Plan, the Company has entered into a trust agreement with the Trustee (the "Trust Agreement"), by which the Trust has been created. The Trust forms a part of the Plan.

The Sellers own all of the issued and outstanding shares of the common stock of the Company. The Sellers desire to sell 49,000 shares of the common stock ("Shares") to the Trustee, and the Trustee desires to purchase the Shares from the Sellers, on the terms and subject to the conditions set forth in this Agreement.

Therefore, the parties agree as follows:

### AGREEMENTS

1.    Sale of Stock. At the closing, each of the Sellers shall sell and deliver to the Trustee, and the Trustee will purchase from each of the Sellers, the number of Shares set forth opposite his or her name:

| Name of Seller | Number of Shares |
|---|---|
| Jane Carey Wheeler and Stephen W. Wheeler | 36,750 |
| Diane L. Gaynor-McCue and Steven F. McCue | 12,250 |

At the closing, the Sellers shall deliver to the Trustee the certificates for the Shares, duly endorsed to the Trustee or accompanied by duly-signed stock powers for transfer to the Trustee, free and clear of all liens, claims, encumbrances, and charges.

2.    Purchase Price. The purchase price for the Shares shall be $5,350,000, or $109.18 per share, which shall be due and payable to the Sellers at the closing in cash, by wire transfer to the account specified by each Seller, or by certified or bank cashier's check payable to the order of each Seller, in the amount set forth opposite each Seller's name below:

| Name of Seller | Purchase Price |
|---|---|
| Jane Carey Wheeler and Stephen W. Wheeler | $4,012,500 |
| Diane L. Gaynor-McCue and Steven F. McCue | $1,337,500 |

3.    <u>Closing</u>.  The closing shall take place on March 13, 2014 (the "Closing Date")  at such time and place as the parties may agree.

4.    <u>ESOP Loan</u>.  On the Closing Date, the Company shall lend to the Trust the sum of $5,350,000.  This loan is referred to in this Agreement as the "ESOP Loan." The Trustee shall apply the proceeds of the ESOP Loan in payment of the purchase price for the Shares.  The ESOP Loan shall be made on the terms and conditions set forth in a loan agreement between the Company and the Plan, which shall be in the form attached to this Agreement as Exhibit "A" (the "ESOP Loan Agreement").  To evidence the obligation of the Plan to repay the ESOP Loan, the Trustee shall sign and deliver to the Company at the closing a promissory note in the form attached to this Agreement as Exhibit "B" (the "ESOP Note").  To secure the obligations of the Plan under the ESOP Note and under the ESOP Loan Agreement, the Trustee shall enter into a stock pledge agreement with the Company in the form attached to this Agreement as Exhibit "C" (the "Stock Pledge Agreement"), pursuant to which the Plan shall pledge the Shares to the Company.

<u>REPRESENTATIONS AND WARRANTIES</u>

5.    <u>Disclosure Schedule</u>.  The Disclosure Schedule referred to in this Agreement is a separate document constituting a part of this Agreement which has been delivered by the Sellers to the Trustee prior to the signing and delivery of this Agreement, and the Disclosure Schedule is subject to the terms and conditions of this Agreement.  The Disclosure Schedule has been prepared by the Sellers in order to enable them to more fully make the representations, warranties, and covenants called for in this Agreement, and it contains, for the purpose of reference and convenience only, headings stating the applicable sections of the representations, warranties, and covenants contained in Section 6 to which it refers.  For purposes of this Agreement, an item disclosed by the Sellers for one purpose shall not be deemed disclosed for another purpose unless specifically so stated.

6.    <u>Representations and Warranties of the Sellers</u>.  The Sellers hereby represent and warrant to the Trustee as follows:

6.1    <u>Corporate Organization</u>.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of California. The Company has full power and authority to carry on its business as it now is being conducted, and to own or hold under lease the properties and assets it now owns or holds under lease, in the places where its business now is conducted and its properties and assets now are owned or held. The Company is a corporation duly qualified to do business, and is in good standing as a foreign corporation, in every jurisdiction in which the nature of the business conducted by the Company or the nature of the properties and assets owned or leased by the Company makes qualification necessary.

6.2    <u>Articles and By Laws</u>.    True, complete, and correct copies of the Company's articles of incorporation and of its bylaws have been delivered to the Trustee.

6.3    <u>Stock of the Company</u>.  (a)  <u>Ownership of Shares</u>.  The Sellers are the record owner and holder of 100,000 fully paid and nonassessable shares of common stock, which

- 2 -

shares comprise all of the issued and outstanding shares of capital stock of the Company. The Sellers own the Shares free and clear of all liens, encumbrances, security agreements, options, claims, and restrictions. The Sellers have full power to transfer the Shares to the Trustee without obtaining the consent or approval of any person or of any governmental authority.

(b)    Capitalization.    The Company is authorized to issue 1,000,000 shares of common stock, all of which have no par value. The Company has no other authorized or outstanding shares of stock. All of the issued and outstanding shares of the Company have been duly and validly issued, are fully paid and nonassessable, and have been issued in full compliance with all applicable federal and state securities laws.

(c)    Title to Shares.    Upon consummation of the transaction provided for in this Agreement and in accordance with the terms of this Agreement, the Trustee will be vested with good and marketable title to the Shares which constitute 49 percent of the issued and outstanding shares of capital stock of the Company, free and clear of any liens, encumbrances, security agreements, options, claims, charges, or restrictions (other than those options and restrictions set forth herein under the Trust Agreement, or under the Plan).

6.4    Subsidiaries.    The Company has no subsidiaries.

6.5    Financial Statements.    (a)    Description.    The Sellers have delivered to the Trustee the balance sheet of the Company as of December 31, 2011, December 31, 2012, and December 31, 2013 (the "Fiscal Year Balance Sheets"), together with the related statements of earnings, stockholders' equity, and cash flows, all of which have been compiled by AKT LLP, the Company's independent public accountants. The Sellers also have delivered to the Trustee the unaudited balance sheet of the Company as of December 31, 2013 (the "December 31, 2013 Balance Sheet"), and the unaudited balance sheet of the Company as of January 31, 2014, together with related unaudited statements of income and retained earnings for the periods ending on such dates, certified by the Treasurer of the Company. The financial statements that the Sellers have delivered to the Trustee are referred to collectively as the "Financial Statements."

(b)    Accuracy.    The December 31, 2013 Balance Sheet is subject to normal year-end adjustments.    Otherwise, the Financial Statements have been prepared in accordance with generally accepted accounting principles consistently followed by the Company throughout the periods indicated, and they fairly present the financial position of the Company as of the respective dates of the balance sheets included in the Financial Statements and the results of the operations of the Company for the respective periods covered by the Financial Statements.

6.6    Interim Operations.    Except for agreements entered into and liabilities incurred in connection with the establishment of the Plan and the financing of the purchase and sale of the Shares contemplated by this Agreement, since December 31, 2013: (a) the businesses of the Company have been carried on in the usual course; (b) there has been no material adverse change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company; and (c) there has been no other material change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company, except in the ordinary course of business.

- 3 -

6.7 <u>Liabilities</u>. Except as reflected on the December 31, 2013 Balance Sheet or as disclosed in that part of the Disclosure Schedule entitled "Liabilities," and except for liabilities that have been incurred by the Company in the ordinary course of business since December 31, 2013, and which are usual and normal in amount, both individually and in the aggregate, there are no liabilities of the Company, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, which exist or which, to the Sellers' knowledge, may arise at any time as a result of or in connection with: (a) the Company's ownership of their respective assets and properties prior to the Closing Date; or (b) the Company's operations of their respective businesses prior to the Closing Date.

6.8 <u>Taxes</u>. The Company has filed all federal, state, county, local, and foreign tax returns which they are required to have filed, and these returns are true and correct. The Company has paid or made adequate provision for the payment of all taxes, interest, penalties, assessments, or deficiencies which have or which may become due pursuant to these returns or pursuant to any assessment received with respect to any of these returns. All federal, state, county, and local income, ad valorem, excise, sales, use, gross receipts, employment security, and other taxes and assessments which are due and payable by the Company have been duly reported, fully paid, and discharged. There are no unpaid taxes which are or which could become a lien on the properties and assets of the Company, except as incurred in the normal course of the business of the Company since December 31, 2013. No claim has ever been made or threatened by any taxing authority in any jurisdiction where the Company does business that the Company has not filed tax returns or that the Company is or may be subject to taxation by that jurisdiction.

6.9 <u>Real Property</u>. The Company does not own any real property. The Company leases certain real property, the description of which, including the terms of the lease are attached to the Disclosure Schedule. The Disclosure Schedule contains a list of all leases and subleases under which the Company is either the lessee (the "Leases"). The Sellers have delivered to the Trustee or its counsel a true and complete copy of every Lease. Each Lease is valid, binding, and enforceable according to its terms, and there does not exist any default or event that with notice or lapse of time, or both, would constitute a default under any of the Leases.

6.10 <u>Other Personal Property</u>. Except as disclosed in the Disclosure Schedule, no Personal Property used by the Company in connection with their respective businesses is held under lease, security agreement, conditional sales contract, or other title retention or security arrangement or is located other than in the possession of the Company.

6.11 <u>Contracts</u>. All of the contracts to which the Company is a party (the "Contracts") are valid, binding, and enforceable according to their terms; there is no default or event that with notice or lapse of time, or both, would constitute a default by any party to any of the Contracts; the Company has not received any notice that any party to any of the Contracts intends to cancel or terminate any of the Contracts; and the Company is not a party to or bound by any agreement that is materially adverse to the business or financial condition of the Company.

- 4 -

6.12    Licenses.  There is set forth in that part of the Disclosure Schedule entitled "Licenses" a true and complete list of all material permits, licenses, franchises, zoning variances, and governmental approvals and authorizations which are held or used by the Company (the "Licenses").  All of the Licenses are in full force and effect, and the Company has not committed any violation of any License which has not been cured, and there are no proceedings pending for the revocation or limitation of any of the Licenses and no proceedings of this kind have been threatened.    There are no material permits, licenses, franchises, zoning variances, or governmental approvals or authorizations which are necessary for the conduct of the business of the Company as now being conducted or as conducted at any time.

6.13    Litigation.  The Company is not subject to any court or administrative judgment, order, or decree affecting their businesses, the assets used in the operation of their businesses, or their right to carry on their businesses as conducted on the date of this Agreement.  There is no litigation or arbitration proceeding, and there are no proceedings before any commission or other administrative or regulatory authority, pending against or affecting the business of the Company, the assets used in the operation of the business of the Company, or the right of the Company to carry on its business as conducted on the date of this Agreement.  No claim which has not ripened into litigation has been made or threatened against the Company, or against any stockholders of the Company, which might affect the business of the Company, the assets used in the operation of the business of the Company, or the right of the Company to carry on their respective businesses as conducted on the date of this Agreement, and no circumstances exist which might give rise to any claim of this kind.

6.14    Corporate Acts.  All corporate acts required of the Company have been taken, and all reports and returns required to be filed by the Company with any governmental agency have been filed.  The Company holds all of the permits, licenses, certificates, and other authorizations of federal, state, local, and foreign governmental agencies required for the conduct of their respective businesses.

6.15    Retirement Plans.    The Company does not maintain any "employee pension benefit plans" within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), except for the Plan and the Roni Hicks & Associates Pension Incentive Plan (the "401(k) Plan").  To the knowledge of the Sellers, the Company has operated the 401(k) Plan in substantial compliance with all applicable provisions of ERISA, of the Internal Revenue Code of 1986, as amended ("Code"), and of all other applicable laws, rules, and regulations. All reports required by any governmental agency with respect to the 401(k) Plan have been filed on a timely basis.

6.16    Authority.  The Company and the Sellers set forth in the first paragraph of this Agreement have the full right, power, and authority to carry out this Agreement in all respects and are not subject to any restriction or agreement which prohibits or would be violated by consummation of the transactions contemplated by this Agreement.

6.17    Employee Relations.

(a)    No Collective Bargaining.  There are no collective bargaining or other labor or trade union agreements to which the Company is a party, and there are no labor,

- 5 -

trade or collective bargaining agreements that pertain to any Company employees. There is no pending or, to the Company's knowledge, threatened union organization activity involving any of the Company's employees, nor has there ever been union representation involving any of the Company's employees.

(b)    <u>No Organized Labor Disputes</u>.    There are, and for the past three years have been, no strikes, slowdowns, lockdowns, arbitrations, work stoppages or material grievances or other organized labor disputes or industrial action pending or, to the Company's knowledge, threatened or reasonably anticipated between the Company and any current or former Company employees or any union or other collective bargaining unit representing such employees.

(c)    <u>Compliance with Employment Laws.</u>    The Company has complied in all material respects, and is in compliance in all material respects, with all laws relating to employment or the workplace, including laws relating to wages, hours, collective bargaining, safety and health, work authorization, equal employment opportunity, discrimination, immigration, withholding, unemployment compensation, unfair dismissal, worker's compensation, employee privacy and right to know.

6.18    <u>Environmental Matters</u>.    The Company is and has been for the last five years, in material compliance with all applicable Environmental Laws (defined below). The Company has not within the last five (5) years received any written request for information or notice with respect to the Company alleging or otherwise regarding any potential liability, noncompliance or any investigatory or remedial obligations arising under applicable Environmental Laws. The Company is in material compliance with all terms and conditions of all permits, licenses and other authorizations required pursuant to applicable Environmental Laws. The Company has at no time within the past five years and is not currently subject to any judicial or administrative proceeding regarding or alleging the violation of or liability under Environmental Laws. To Sellers' knowledge, there are no conditions, occurrences or activities that have given rise to material liability against the Company under any Environmental Laws. "Environmental Laws" shall mean all applicable foreign, federal, State or local statutes, laws, codes, rules, regulations, ordinances, orders, permits or licenses in effect as of the Closing Date pertaining to the protection, preservation, conservation or regulation of the environment. The representations and warranties contained in this Section 6.18 are the sole and exclusive representations and warranties of the Sellers with respect to environmental matters.

6.19    <u>Licenses, Patents, Trademarks</u>.    The Company owns or has adequate rights to use all letters patent, patents, patent applications, patent and know-how licenses, trade names, trademark registrations and applications, common law trademarks, and copyright registrations and applications (collectively, the "Intangibles"), and all inventions, technology, processes, designs, know-how and formulae now or heretofore used in the conduct of its business, in each case free and clear of any and all liens, claims, pledges, encumbrances, charges, agreements, options or other restrictions. To the best knowledge of the Sellers, the Company has not infringed and is not infringing and has not engaged in the unauthorized use or misappropriation of any Intangibles, invention, technology, process, design, computer program, know-how or formulae of another, and there are no actual or threatened claims or assertions against the

- 6 -

Company relating thereto. To the best knowledge of Sellers, no Intangibles of the Company are being infringed by others.

6.20    Insurance. The Trustee has been provided with a complete list of all binders, policies of insurance, self insurance programs or fidelity bonds ("Insurance") maintained by the Company or in which the Company is a named insured. All Insurance (i) has been issued by financially sound insurance companies under valid and enforceable policies or binders for the benefit of the Company, and all such policies or binders are in such types and full force and effect and are in amounts and for risks, casualties and contingencies customarily insured against by enterprises in operations similar to the Company; and (ii) satisfy contractual requirements (under the Company's Leases, loan agreements with its lender or otherwise) regarding the carrying of Insurance by the Company. There are no pending or asserted claims against any Insurance as to which any insurer has denied liability and there are no claims under any Insurance that have been disallowed or improperly filed. No notice of cancellation or nonrenewal with respect to, or material increase of premium for, any Insurance has been received by the Company. To the knowledge of the Company, there has been no event which (a) reasonably might form the basis of any claim against the Company relating to the conduct or operations of the Company and which will materially increase the insurance premiums payable under any Insurance, or (b) otherwise will materially increase the insurance premiums payable under any Insurance.

6.21    Pre- and post-Transaction Solvency. The Company is and, after giving effect to the transactions contemplated by this Agreement (including, without limitation, the declaration and payment of the pre-transaction dividend of the Accumulated Adjustments Account distribution referred to in Section 9 hereinbelow (the "AAA Distribution"), the Company's making of the ESOP Loan to the Trustee to enable the Trustee to purchase the Shares and the Company's receipt of loans from First American Bank (the "Bank Loans") for the purpose of, among others, funding the ESOP Loan, referred to herein as the "transactions contemplated by this Agreement"), will be: (a) in compliance with the requirements of Sections 500-509 of the California Corporations Code ("CCC Section 500") based on the most recent financial statements available to the Sellers at the time of Closing Date, (b) the Company's working capital is adequate to meet its current and projected obligations to creditors as and when they become due; and (c) the Company will not be left with an unreasonably small amount of capital with which to meet its obligations

6.22    Disclosure. None of the representations or warranties made by the Sellers in this Agreement, and none of the statements made in the Disclosure Schedule or any document furnished pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state any material fact necessary in order to make the statements contained herein or therein not misleading.

7.    Representations and Warranties of the Trustee. The Trustee hereby represents and warrants to the Sellers as follows:

7.1    Authority. On behalf of the Plan, the Trustee has the right, power, and legal capacity to enter into this Agreement and to consummate the transaction contemplated by this Agreement. The signing, delivery, and performance of this Agreement by the Trustee have

- 7 -

been duly and properly authorized, and this Agreement is valid and binding upon the Plan in accordance with its terms, except as limited by ERISA or by bankruptcy, insolvency, reorganization, or other laws affecting the enforcement of creditors' rights generally, and subject to the availability of equitable remedies.

      7.2    No Conflicts.  Neither the signing and delivery of this Agreement nor performance of this Agreement by the Trustee on behalf of the Plan will: (a) conflict with or result in the breach of the Plan or of any contract or agreement to which the Trustee is a party or by which it is bound; (b) require the Trustee to obtain the consent or approval of, or make any filing with, any person or public authority; or (c) violate any law, regulation, judgment, or order binding upon the Plan.

      7.3    Broker's Fees.  The Trustee has not incurred any brokerage or finder's fees with respect to the transaction covered by this Agreement for which the Sellers may be liable.

      7.4    Accuracy of Representations and Warranties.  No representation, warranty, or covenant by the Trustee in this Agreement, and no certificate, schedule, or exhibit to this Agreement furnished or to be furnished by or on behalf of the Trustee, and no document or certificate delivered to the Sellers pursuant to this Agreement or in connection with actions contemplated by this Agreement, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not misleading.

## CONDITIONS PRECEDENT TO CLOSING

    8.    Conditions Precedent to the Obligations of the Trustee.  The obligations of the Trustee under this Agreement, including the obligation of the Trustee to close the transactions contemplated by this Agreement, are subject to the following conditions precedent:

      (a)    Compliance with Obligations.  The Sellers and the Company shall have performed and complied with all of their obligations under this Agreement which are to be performed or complied with by them, including the delivery to the Trustee of the documents specified in this Agreement.

      (b)    Disbursement of ESOP Loan.  The Company shall have made the ESOP Loan to the Plan.

      (c)    Valuation Opinion.  The Trustee shall have obtained an opinion from Prairie Capital Advisors, Inc., or from another valuation consulting firm selected by the Trustee, that: (i) the purchase price for the Shares does not exceed the fair market value of the Shares; (ii) the interest rate on the ESOP Loan is reasonable; (iii) the terms of the ESOP Loan are as favorable to the Plan as the terms of a comparable loan resulting from arm's-length negotiations between independent parties; and (iv) the overall transaction contemplated by this Agreement is fair to the Plan from a financial point of view. This opinion shall be dated as of the Closing Date.

(d)    <u>Not a Prohibited Transaction</u>.  The Trustee shall have determined that the purchase of the Shares is not imprudent.

(e)    <u>Employment Agreements</u>.  Each of the Sellers shall have entered into five-year employment agreements with the Company on terms reasonably satisfactory to the Trustee, in its sole discretion.

9.    <u>Conditions Precedent to Obligations of the Sellers</u>.  The obligations of the Sellers under this Agreement, including their obligations to close the transaction contemplated by this Agreement, are subject to the following conditions:

(a)    <u>General</u>.  The Trustee shall have performed and complied with all of its obligations under this Agreement, including the delivery by the Trustee to the Sellers of the documents specified in this Agreement.

(b)    <u>Distribution of Previously-Taxed Earnings</u>.  For the years during which the Company's "S election" was in effect for income tax purposes, the Company's income was taxed to its shareholders. Prior to the Closing Date, and subject to the requirements of CCC Section 500, the Board of Directors of the Company shall declare a dividend which shall be payable to the shareholders of record as of a specified dated immediately prior to the Closing Date. The amount of the dividend to be declared is $333,000 ("AAA Amount").  Such amount is equal to *the lesser of* (a) the amount credited to the Company's "Accumulated Adjustments Account" as of December 31, 2013; or (b) the amount of the Accumulated Adjustments Account that is permitted to be distributed without violating the requirements of CCC Section 500 based on the most recent financial statements available to the Sellers at the time of the Closing Date. For purposes of this Agreement, the term "Accumulated Adjustments Account" shall have the meaning set forth in section 1368(e)(1) of the Code.  The dividends, to the extent permitted to be paid hereunder, shall be paid in cash and in one lump sum.

<u>DELIVERIES AT CLOSING</u>

10.    <u>Documents to be Signed and Delivered by the Company and the Trustee at Closing</u>.  At the closing, the Company and the Trustee shall sign and deliver the ESOP Loan Agreement and the Stock Pledge Agreement.  Also at the closing, the Trustee shall sign and deliver to the Company the ESOP Note.

11.    <u>Funds to be Delivered by the Company at Closing</u>.  At the closing, the Company shall loan to the Trustee $5,350,000 by means of a wire transfer of funds to the Trustee.

12.    <u>Documents to be Delivered by the Company and the Sellers at Closing</u>.  At the closing, the Company and the Sellers shall deliver to the Trustee the following documents in form and substance acceptable to counsel for the Trustee:

(a)    the certificate or certificates representing the Shares, duly endorsed or accompanied by duly-signed stock powers for transfer to the Trustee;

(b)    copies of resolutions of the Board of Directors of the Company, certified by the Secretary of the Company as having been duly and validly adopted and as being

- 9 -

in full force and effect, authorizing the following: the adoption of the Plan; the signing and delivery of the Trust Agreement; the appointment of the Trustee; the signing and delivery of the ESOP Loan Agreement and of the Stock Pledge Agreement; the distribution of the AAA Amount, the approval of the external financing with First American Bank and the signing and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; and

        (c)      any other documents that the Trustee may reasonably request.

      13.    <u>Funds and Documents to be Delivered by the Trustee at Closing</u>. At the Closing, the Trustee shall pay to the Sellers $5,350,000 by means of a wire transfer of funds into checking accounts at depositories that shall be designated by the Sellers.

POST-CLOSING MATTERS

      14.    <u>Survival of Representations, Warranties, and Covenants</u>. The representations, warranties, covenants, agreements, and indemnities set forth in this Agreement or made pursuant to this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of any of the parties and shall survive for a period of twenty four months after the closing and transfers of the Shares pursuant to this Agreement ("Applicable Survival Period").

      15.    <u>Indemnification</u>. (a) <u>General</u>. Subject to the limitation set forth in subsection (b) below, the Sellers shall indemnify the Company and the Trustee for any loss, cost, expense, or other damage, including attorney's fees, suffered by the Company or by the Trustee resulting from, arising out of, or incurred with respect to: (i) the falsity or the breach of any representation, warranty, or covenant made by the Sellers in this Agreement; or (ii) any claim brought by any person relating to the business operations conducted by the Company prior to the Closing Date (collectively, "Indemnified Losses").

        (b)     <u>Limitation</u>.    Notwithstanding any other provision of this Agreement to the contrary:

          (i)     no Seller shall be liable for any Indemnified Loss relating to any breach of any representation or warranty (A) unless the claim for the Loss is brought within the Applicable Survival Period, and (B) unless and until the aggregate amount of all Losses incurred by the Trustee exceeds $54,000 (the "Basket Amount"), and once the Basket Amount is exceeded, all Indemnified Losses, including the Basket Amount, shall be recoverable; and

          (ii)    the aggregate cumulative indemnification obligations of the Sellers under Section 15 shall in no event exceed $4,000,000 (the "Indemnity Cap").

The Trustee acknowledges and agrees that its sole and exclusive remedy with respect to any and all matters arising out of, relating to or connected with this Agreement against the Sellers and the Company, and their respective assets and liabilities (other than claims of, or causes of action arising from, fraud or intentional misrepresentation), shall be pursuant to the indemnification provisions set forth in this Section 15.

- 10 -

(c)    Notice.  The Company or the Trustee shall assert any right to indemnification by furnishing to the Sellers a written notice and list of charges detailed by item and showing the nature of any breach of any representation, warranty, or covenant or the nature of any other claim, the date of payment or assertion of a claim, a summary of settlement or litigation procedures, and the amount of the loss, cost, or expense.  If the right to indemnification of the Company or of the Trustee is based upon a claim of a third party, the Company or the Trustee shall give notice to the Sellers within 30 days after it receives notice of the claim; and the Sellers shall have the right to contest any claim by a third party.  The giving of notice by the Company or by the Trustee of one or more claims shall not preclude them from giving subsequent notices of other claims, whether arising before or after the claims of which prior notice has been given.

(d)    Arbitration.  If any claim by the Company or by the Trustee for indemnification against the Sellers is not settled within 90 days after notice of the claim is given to the Sellers, then the claim shall be submitted to arbitration in the manner provided in Section 20, provided, however, that if such claim arises from a claim of a third party, and Sellers have exercised its right to contest and is diligently contesting such claim, then such claim shall not be submitted to arbitration until the conclusion of such contest by Sellers.

## COVENANTS OF THE COMPANY AND SELLERS

The Company hereby covenants and agrees with the Sellers and the Trustee as follows:

16.    Maintenance of Company and Workforce.  The Company will maintain its existence and, unless severely adverse business conditions develop, will not materially decrease the size of its workforce in a manner that would inhibit the allocation of the Shares to the participants in the Plan.

17.    Maintenance of the Plan.  Subject to the right of the Company to amend or terminate the Plan in accordance with the terms of the Plan, the Company will take all actions within its power to preserve the existence of the Plan and Trust and maintain their tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code.  The Company shall administer the Plan in compliance with (a) the Code and ERISA, as applicable to the Plan and this Agreement, and (b) all other laws and regulations applicable to the Plan and the Trust.

18.    Contributions to the Plan.  For as long as the ESOP Note is outstanding, the Company will make contributions to the Plan in amounts which are sufficient, when combined with dividends paid on the shares of Company stock held by the Trust, to enable the Trustee to pay, on a timely basis, all interest and principal due on the ESOP Note.

19.    Tax-Ruling.  The Company will promptly file with the Internal Revenue Service an application for a favorable letter of determination regarding the status of the Plan as a qualified plan under Section 401(a) of the Code and regarding the status of the Trust as a tax-exempt trust under Section 501(a) of the Code.  The Company hereby agrees that it will adopt any amendments to the Plan that are required by the Internal Revenue Service in order to obtain a favorable letter of determination with respect to the Plan within the time prescribed by law for obtaining an effective date for the amendments retroactive to the date of adoption of the Plan.

- 11 -

20.    Covenant Not to Compete.  During the term of each Seller's employment with the Company and for a period of two years following the termination of her employment with the Company, the Seller shall not, directly or indirectly, compete with, or attempt to compete with, the Company or contract with any customers of the Company for her own interest or otherwise. For purposes of this Agreement, the covenant given by the Employee under this Section 20 shall be referred to as the "Non-Compete Covenant." The Company and the Sellers acknowledge that the Non-Compete Covenant has been provided as consideration in connection with the sale of the Shares pursuant to this Agreement.

21.    Composition of Board of Directors.  Within six months following the Closing Date, the Company will use its best efforts, in consultation with the Trustee, to add one or more independent members to its Board of Directors.

22.    Insurance for Principals.  As soon as reasonably practicable, the Company will use its best efforts to put in place Directors and Officers, Employee Practices and ERISA fiduciary insurance coverages with limits of at least $1,000,000 per occurrence.

## MISCELLANEOUS

23.    Arbitration.  Any controversy or claim arising out of or relating to this Agreement or any alleged breach of this Agreement shall be settled by arbitration in San Diego, California in accordance with the rules of the American Arbitration Association then in force, except that a written opinion of the arbitrators must be delivered to the parties notwithstanding any rules to the contrary. Three arbitrators shall be selected to settle the controversy or claim, with the Trustee nominating one arbitrator, the Sellers nominating the second arbitrator, and the first and second arbitrators jointly nominating the third arbitrator. The arbitrators shall be persons experienced in negotiating and in making and consummating stock purchase agreements on behalf of employee stock ownership plans. A judgment upon the award entered by the majority of the arbitrators shall be entered in any court having jurisdiction. Subject to the requirements of, and restrictions contained in ERISA, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in any arbitration or court proceeding.

24.    Notice.  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be delivered in person or sent by certified mail, postage prepaid, or by private express mail, and properly addressed as follows:

TO THE SELLERS:          Jane Carey Wheeler and Stephen W. Wheeler
                         11682 El Camino Real
                         San Diego, California 92130

                         Diane L. Gaynor-McCue and Steven F. McCue
                         11682 El Camino Real
                         San Diego, California 92130

with a copy to:          Morgan, Lewis & Bockius LLP
                         77 West Wacker Drive
                         Chicago, Illinois 60601
                         Attention: Brian Hector

- 12 -

| | |
|---|---|
| TO THE COMPANY: | Roni Hicks & Associates<br>11682 El Camino Real<br>San Diego, California 92130<br>Attention:  President |
| with a copy to: | Morgan, Lewis & Bockius LLP<br>77 West Wacker Drive<br>Chicago, Illinois 60601<br>Attention:  Brian Hector |
| TO THE TRUSTEE: | First Bankers Trust Services, Inc.<br>15 Salt Creek Lane<br>Hinsdale, Illinois 60521<br>Attention:  Marilyn Marchetti |
| with a copy to: | Schatz Brown Glassman Kossow LLP<br>250 Mill Street<br>Rochester, New York 14614<br>Attention:  Robert Brown |

Any notice, request, or communication, if given by registered or certified letter or by private express mail, shall be deemed to have been given when deposited in the united states mails or with the private express mail delivery service, postage prepaid; and if given otherwise than by registered or certified letter or by private express mail, then the notice, request, or communication shall be deemed to have been given when received. Failure to give or receive copies of notices shall not be deemed to be a failure to give notice.

26. <u>Expenses</u>.  The Sellers shall be responsible for the fees and expenses incurred by them in connection with this transaction, and the Company shall be responsible for all fees and expenses incurred by the Trustee and the Company in connection with this transaction.

26. <u>Governing Law</u>.  This Agreement shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of Illinois.

27. <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

28. <u>Waivers</u>.  Any party may, by written notice to another party:  (a) extend the time for the performance of any of the obligations or other actions of the other party under this Agreement; (b) waive any inaccuracies in the representations or warranties of any other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions or covenants of any other party contained in this Agreement; or (d) waive or modify performance of any of the obligations of any other party under this Agreement.  Except as provided in the preceding sentence, no action taken pursuant to this Agreement including, without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking the action of compliance with any representations, warranties, covenants, or agreements contained in this Agreement. The waiver

- 13 -

by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

29.    Entire Agreement.    This Agreement supersedes all prior agreements and understandings between the parties and may not be changed or terminated orally, and no attempted change, termination, or waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by the party against whom the change, termination, or waiver is sought to be enforced.

30.    Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

31.    Action as Trustee.  First Bankers Trust Services, Inc. has signed and delivered this Agreement solely as Trustee of the Trust, and not in any individual capacity or in its corporate capacity.  The performance of this Agreement by the Trustee, and all duties, obligations, and liabilities of the Trustee under this Agreement, will be undertaken by First Bankers Trust Services, Inc. only in its capacity as the Trustee of the Trust. First Bankers Trust Services, Inc. does not undertake any individual liability or obligation by virtue of the signing and delivery of this Agreement or by reason of the representations, warranties, and covenants contained in this Agreement.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first above written.

SELLERS:

_____
Jane Carey Wheeler

_____
Stephen W. Wheeler

_____
Diane L. Gaynor-McCue

_____
Steven F. McCue

THE COMPANY:
INTEGRATEDMARKETING.COM

By: _____
Jane Carey Wheeler
Its: President

TRUSTEE: First Bankers Trust Services, Inc., not in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

By:_____
Its:_____

[Signature Page to Stock Purchase Agreement]

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first above written.

SELLERS:                                      THE COMPANY:
                                              INTEGRATEDMARKETING.COM

_____             By:_____
Jane Carey Wheeler                                 Jane Carey Wheeler
                                                   Its: President

_____
Stephen W. Wheeler

_____
Diane L. Gaynor-McCue

_____             TRUSTEE: First Bankers Trust Services, Inc.,
Steven F. McCue                               not in its corporate capacity, but solely as
                                              Trustee of the Roni Hicks & Associates
                                              Employee Stock Ownership Trust

                                              By: _Marilyn Marchetti_
                                              Its: _Corporate Advisor, Employee benefit Counsel_

[Signature Page to Stock Purchase Agreement]

## SCHEDULE 6.7

### Liabilities

None.

## SCHEDULE 6.9

### Real Property Leases

Lease Agreement dated November 14, 2006 between the Company and Pacific North Court Holdings, L.P., as amended by the First Amendment to Lease dated March 21, 2013 for the property located at 11682 El Camino Real, Suite 200, San Diego, California 92130. Current Base Rent is $33,697.40 per month and the lease expires on March 31, 2019.

**SCHEDULE 6.10**

**Leased Personal Property**

1. Premier Lease Agreement dated September 22, 2011 between the Company and Konica Minolta Premier Finance for the lease of one Bizhub Press C6000.

2. Motor Vehicle Lease Agreement (Closed End) dated September 18, 2013 between the Company and BMW Encinitas for 2013 BMW 750I.

3. Lease Agreement dated October 19, 2011 between the Company and Herman Cook VW, Inc. for 2012 Volkswagen Passat.

4. Motor Vehicle Lease Agreement with Arbitration Clause – California dated October 24, 2013 between the Company and Hoehn Infiniti for 2014 Infiniti Q50.

## SCHEDULE 6.12

### Licenses

1.  City of San Diego Business Tax Certificate No. 1999012991 (Exp. 4/30/14)

2.  California State Board of Equalization Seller's Permit No. SR FH 97-556053

# EXHIBIT B

Exhibit B Page 43

*Execution Version*

STOCK PURCHASE AGREEMENT

BY AND AMONG

JANE CAREY WHEELER, STEPHEN W. WHEELER, DIANE L.
GAYNOR-McCUE, AND STEVEN F. McCUE, as Sellers,

INTEGRATEDMARKETING.COM (D/B/A RONI HICKS & ASSOCIATES), as the Company,

and

FIRST BANKERS TRUST SERVICES, INC., as Trustee

June 30, 2017

# TABLE OF CONTENTS

Page

AGREEMENTS ................................................................................................................. 1

1.    Sale of Stock ........................................................................................................... 1

2.    Purchase Price ........................................................................................................ 1

3.    Closing ................................................................................................................... 2

4.    ESOP Loan ............................................................................................................. 2

REPRESENTATIONS AND WARRANTIES ................................................................. 2

5.    Disclosure Schedule ............................................................................................... 3

6.    Representations and Warranties of the Sellers ...................................................... 3

      6.1    Corporate Organization ................................................................................ 3

      6.2    Articles and By Laws .................................................................................... 3

      6.3    Stock of the Company ................................................................................... 3

      6.4    Subsidiaries .................................................................................................. 4

      6.5    Financial Statements .................................................................................... 4

      6.6    Interim Operations ....................................................................................... 4

      6.7    Liabilities ..................................................................................................... 4

      6.8    Taxes ............................................................................................................ 4

      6.9    Real Property ............................................................................................... 5

      6.10   Other Personal Property ............................................................................... 5

      6.11   Contracts ...................................................................................................... 5

      6.12   Licenses ........................................................................................................ 5

      6.13   Litigation ...................................................................................................... 5

      6.14   Corporate Acts ............................................................................................. 6

      6.15   Retirement Plans .......................................................................................... 6

      6.16   Authority ...................................................................................................... 6

      6.17   Employee Relations ...................................................................................... 6

      6.18   Environmental Matters ................................................................................. 7

      6.19   Licenses, Patents, Trademarks ..................................................................... 7

      6.20   Insurance ...................................................................................................... 7

      6.21   Pre- and post-Transaction Solvency ............................................................ 8

      6.22   Disclosure .................................................................................................... 8

DB1/ 90455415.7

## TABLE OF CONTENTS
(continued)

7. Representations and Warranties of the Trustee ............................................. 8
   7.1 Authority ............................................................................. 8
   7.2 No Conflicts ........................................................................ 8
   7.3 Broker's Fees ...................................................................... 8
   7.4 Accuracy of Representations and Warranties ................................ 8

CONDITIONS PRECEDENT TO CLOSING ......................................... 9

8. Conditions Precedent to the Obligations of the Trustee ..................... 9
9. Conditions Precedent to Obligations of the Sellers ........................... 9

DELIVERIES AT CLOSING ............................................................. 9

10. Documents to be Signed and Delivered by the Company and the Trustee at Closing ............................................................................... 9
11. Funds to be Delivered by the Company at Closing ........................... 10
12. Documents to be Delivered by the Company and the Sellers at Closing ....... 10
13. Funds and Documents to be Delivered by the Trustee at Closing ............ 10

POST-CLOSING MATTERS ............................................................. 10

14. Survival of Representations, Warranties, and Covenants ..................... 10
15. Indemnification ....................................................................... 10

COVENANTS OF THE COMPANY AND SELLERS ................................ 11

16. Maintenance of Company and Workforce ....................................... 11
17. Maintenance of the Plan ............................................................ 11
18. Contributions to the Plan ........................................................... 12
19. Tax-Ruling ............................................................................ 12
20. Covenant Not to Compete .......................................................... 12
21. Composition of Board of Directors ............................................... 13
22. Insurance for Principals ............................................................ 13

MISCELLANEOUS ....................................................................... 13

23. Arbitration ............................................................................ 13
24. Notice .................................................................................. 13
25. Expenses ............................................................................... 14
26. Governing Law ........................................................................ 14

# TABLE OF CONTENTS
(continued)

27.  Successors and Assigns .................................................................................... 15

28.  Waivers ............................................................................................................. 15

29.  Entire Agreement .............................................................................................. 15

30.  Counterparts ..................................................................................................... 15

31.  Action as Trustee ............................................................................................. 15

## TABLE OF CONTENTS

EXHIBITS

A    -    Seller Note
B    -    Seller Credit Agreement
C    -    Seller Pledge Agreement
D    -    ESOP Loan Agreement
E    -    ESOP Note
F    -    ESOP Pledge Agreement
G    -    Employment Agreements

DB1/ 90455415.7

*Execution Version*

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement is made and entered into this 30th day of June, 2017 by and among the following parties: Jane Carey Wheeler and Stephen W. Wheeler, as wife and husband, and Diane L. Gaynor-McCue, and Steven F. McCue, as wife and husband (the "Sellers"); INTEGRATEDMARKETING.COM, a California corporation d/b/a Roni Hicks & Associates (the "Company"); First Bankers Trust Services, Inc. (the "Trustee"), not in its corporate capacity, but solely in its capacity as trustee of Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust"). For purposes of Sections 5, 6, and 20, the term "Sellers" shall mean Jane Carey Wheeler and Diane L. Gaynor-McCue.

## RECITALS

The Company has adopted an employee stock ownership plan known as "Roni Hicks & Associates Employee Stock Ownership Plan," as amended and restated, effective January 1, 2017 (the "Plan"). In order to implement the Plan, the Company has entered into a trust agreement with the Trustee (the "Trust Agreement"), by which the Trust has been created. The Trust forms a part of the Plan.

The Sellers own 51,000 of the issued and outstanding shares of the common stock of the Company. The Sellers desire to sell 51,000 shares of the common stock ("Shares") to the Trustee, and the Trustee desires to purchase the Shares from the Sellers, on the terms and subject to the conditions set forth in this Agreement (the "Transaction").

Therefore, the parties agree as follows:

## AGREEMENTS

1.    <u>Sale of Stock</u>.  At the closing, each of the Sellers shall sell and deliver to the Trustee, and the Trustee will purchase from each of the Sellers, the number of Shares set forth opposite his or her name:

| Name of Seller | Number of Shares |
|---|---|
| Jane Carey Wheeler and Stephen W. Wheeler | 38,250 |
| Diane L. Gaynor-McCue and Steven F. McCue | 12,750 |

At the closing, the Sellers shall deliver to the Trustee the certificates for the Shares, duly endorsed to the Trustee or accompanied by duly-signed stock powers for transfer to the Trustee, free and clear of all liens, claims, encumbrances, and charges.

2.    <u>Purchase Price</u>.  The purchase price for the Shares shall be $8,400,000, or approximately $164.71 per share, which shall be allocated to the Sellers as set forth below:

| Name of Seller | Purchase Price |
|---|---|
| Jane Carey Wheeler and Stephen W. Wheeler | $6,300,000.00 |
| Diane L. Gaynor-McCue and Steven F. McCue | $2,100,000.00 |

3.    <u>Closing</u>.  The closing shall take place on June 30, 2017 (the "Closing Date") at such time and place as the parties may agree.

4.    <u>Form of Payment</u>.  (a) <u>General</u>. The Trustee will pay for the Shares by delivering to the Sellers at closing (i) cash, by wire transfer to the account specified by each Seller, or by certified or bank cashier's check payable to the order of each Seller, in the amount set forth opposite each Seller's name below, and (b) a promissory note in the principal amounts set forth opposite each Seller's name below:

| Name of Seller | Cash | Seller Note |
|---|---|---|
| Jane Carey Wheeler and Stephen W. Wheeler | $4,836,733.50 | $1,463,266.50 |
| Diane L. Gaynor-McCue and Steven F. McCue | $1,612,244.50 | $487,755.50 |

(b)    <u>Seller Loans</u>.  The promissory notes that the Trustee will deliver to the Sellers in payment for the portion of the Shares that were purchased with the Seller Notes is referred to in this Agreement as the "Seller Notes" and the loans evidenced by the Seller Notes are referred to in this Agreement as the "Seller Loans." The Seller Notes shall be in the form attached to this Agreement as Exhibit "A." The extensions of credit evidenced by the Seller Notes shall be on the terms and subject to the conditions set forth in a loan agreement between each Seller and the Trust, which shall be in the form attached to this Agreement as Exhibit "B" (the "Seller Credit Agreements"). To secure the obligations of the Trust under the Seller Notes and under the Seller Credit Agreements, the Trustee will enter into a stock pledge agreement with each Seller in the form attached to this Agreement as Exhibit "C" (the "Seller Pledge Agreement"), pursuant to which the Trustee will pledge the Shares that were purchased with the Seller Note to the Seller.

(c)    <u>ESOP Loan</u>.  On the Closing Date, the Company shall lend to the Trust the sum of $6,448,978.00. This loan is referred to in this Agreement as the "ESOP Loan." The Trustee shall apply the proceeds of the ESOP Loan in payment of the purchase price for the Shares. The ESOP Loan shall be made on the terms and conditions set forth in a loan agreement between the Company and the Trust, which shall be in the form attached to this Agreement as Exhibit "D" (the "ESOP Loan Agreement"). To evidence the obligation of the Trust to repay the ESOP Loan, the Trustee shall sign and deliver to the Company at the closing a promissory note in the form attached to this Agreement as Exhibit "E" (the "ESOP Note"). To secure the obligations of the Trust under the ESOP Note and under the ESOP Loan Agreement, the Trustee shall enter into a stock pledge agreement with the Company in the form attached to this Agreement as Exhibit "F" (the "ESOP Pledge Agreement"), pursuant to which the Trust shall pledge the Shares to the Company.

## REPRESENTATIONS AND WARRANTIES

5. <u>Disclosure Schedule</u>. The Disclosure Schedule referred to in this Agreement is a separate document constituting a part of this Agreement which has been delivered by the Sellers to the Trustee prior to the signing and delivery of this Agreement, and the Disclosure Schedule is subject to the terms and conditions of this Agreement. The Disclosure Schedule has been prepared by the Sellers in order to enable them to more fully make the representations, warranties, and covenants called for in this Agreement, and it contains, for the purpose of reference and convenience only, headings stating the applicable sections of the representations, warranties, and covenants contained in Section 6 to which it refers.  For purposes of this Agreement, an item disclosed by the Sellers for one purpose shall be deemed disclosed for another purpose to the extent that the relevance for such other purpose is reasonably apparent on the face of such disclosure.

6. <u>Representations and Warranties of the Sellers</u>.  The Sellers hereby represent and warrant to the Trustee, jointly and severally (except with respect to Section 6.3(c), which shall be severally and not jointly) as follows:

6.1 <u>Corporate Organization</u>.  The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of California. The Company has full power and authority to carry on its business as it now is being conducted, and to own or hold under lease the properties and assets it now owns or holds under lease, in the places where its business now is conducted and its properties and assets now are owned or held. The Company is a corporation duly qualified to do business, and is in good standing as a foreign corporation, in every jurisdiction in which the nature of the business conducted by the Company or the nature of the properties and assets owned or leased by the Company makes qualification necessary.

6.2 <u>Articles and By Laws</u>.  True, complete, and correct copies of the Company's articles of incorporation and of its bylaws have been delivered to the Trustee.

6.3 <u>Stock of the Company</u>. (a) <u>Ownership of Shares</u>.  The Sellers are the record owner and holder of 51,000 fully paid and nonassessable shares of common stock, which together with the 49,000 shares of the Company's common stock owned by the Trust, comprise all of the issued and outstanding shares of capital stock of the Company.  The Sellers own the Shares free and clear of all liens, encumbrances, security agreements, options, claims, and restrictions. The Sellers have full power to transfer the Shares to the Trustee without obtaining the consent or approval of any person or of any governmental authority.

(b) <u>Capitalization</u>.  The Company is authorized to issue 1,000,000 shares of common stock, all of which have no par value.  The Company has no other authorized or outstanding shares of stock. All of the issued and outstanding shares of the Company have been duly and validly issued, are fully paid and nonassessable, and have been issued in full compliance with all applicable federal and state securities laws.  The Company does not have any ownership interest in any subsidiary, affiliate, or other entity.

(c) <u>Title to Shares</u>.  Upon consummation of the transaction provided for in this Agreement and in accordance with the terms of this Agreement, the Trustee will be

vested with good and marketable title to the Shares which constitute 51 percent of the issued and outstanding shares of capital stock of the Company, free and clear of any liens, encumbrances, security agreements, options, claims, charges, or restrictions (other than those options and restrictions set forth herein under the Trust Agreement, or under the Plan).

6.4    Subsidiaries.  The Company has no subsidiaries.

6.5    Financial Statements.  (a) Description.  The Sellers have delivered to the Trustee the balance sheet of the Company as of December 31, 2014, December 31, 2015, and December 31, 2016, together with the related statements of earnings, stockholders' equity, and cash flows, all of which have been reviewed by Aldrich CPAs + Advisors LLP, the Company's independent public accountants.  The Sellers also have delivered to the Trustee the unaudited balance sheet of the Company as of April 30, 2017 (the "Interim Balance Sheet"), together with related unaudited statements of income and retained earnings for the periods ending on such date, certified by the Treasurer of the Company.  The financial statements that the Sellers have delivered to the Trustee are referred to collectively as the "Financial Statements."

(b)    Accuracy.  The Interim Balance Sheet is subject to normal year-end adjustments.  Otherwise, the Financial Statements have been prepared in accordance with generally accepted accounting principles consistently followed by the Company throughout the periods indicated, and they fairly present the financial position of the Company as of the respective dates of the balance sheets included in the Financial Statements and the results of the operations of the Company for the respective periods covered by the Financial Statements.

6.6    Interim Operations.  Except for agreements entered into and liabilities incurred in connection with the establishment of the Plan and the financing of the purchase and sale of the Shares contemplated by this Agreement, since December 31, 2016: (a) the business of the Company has been carried on in the usual course;  (b) there has been no material adverse change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company; and (c) there has been no other material change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company, except in the ordinary course of business.

6.7    Liabilities.  Except as reflected on the December 31, 2016 Balance Sheet or as disclosed in that part of the Disclosure Schedule entitled "Liabilities," and except for liabilities that have been incurred by the Company in the ordinary course of business since December 31, 2016, and which are usual and normal in amount, both individually and in the aggregate, there are no liabilities of the Company, whether accrued, absolute, contingent, or otherwise, and whether due or to become due, which exist or which, to the Sellers' knowledge, may arise at any time as a result of or in connection with: (a) the Company's ownership of their respective assets and properties prior to the Closing Date; or (b) the Company's operations of its business prior to the Closing Date.

6.8    Taxes.  The Company has filed all federal, state, county, local, and foreign tax returns which they are required to have filed, and these returns are true and correct.  The Company has paid or made adequate provision for the payment of all taxes, interest, penalties, assessments, or deficiencies which have or which may become due pursuant to these returns or

- 4 -

pursuant to any assessment received with respect to any of these returns. All federal, state, county, and local income, ad valorem, excise, sales, use, gross receipts, employment security, and other taxes and assessments which are due and payable by the Company have been duly reported, fully paid, and discharged. There are no unpaid taxes which are or which could become a lien on the properties and assets of the Company, except as incurred in the normal course of the business of the Company since December 31, 2016. No claim has ever been made or threatened by any taxing authority in any jurisdiction where the Company does business that the Company has not filed tax returns or that the Company is or may be subject to taxation by that jurisdiction.

6.9    Real Property.  The Company does not own any real property.  The Company leases certain real property, the description of which, including the terms of the lease are attached to the Disclosure Schedule. The Disclosure Schedule contains a list of all leases and subleases under which the Company is the lessee (the "Leases"). The Sellers have delivered to the Trustee or its counsel a true and complete copy of every Lease. Each Lease is valid, binding, and enforceable according to its terms, and there does not exist any default or event that with notice or lapse of time, or both, would constitute a default under any of the Leases.

6.10    Other Personal Property.  Except as disclosed in the Disclosure Schedule, no personal property used by the Company in connection with its business is held under lease, security agreement, conditional sales contract, or other title retention or security arrangement or is located other than in the possession of the Company.

6.11    Contracts.  All of the contracts to which the Company is a party (the "Contracts") are valid, binding, and enforceable according to their terms; there is no default or event that with notice or lapse of time, or both, would constitute a default by any party to any of the Contracts; the Company has not received any notice that any party to any of the Contracts intends to cancel or terminate any of the Contracts; and the Company is not a party to or bound by any agreement that is materially adverse to the business or financial condition of the Company.

6.12    Licenses.  There is set forth in that part of the Disclosure Schedule entitled "Licenses" a true and complete list of all material permits, licenses, franchises, zoning variances, and governmental approvals and authorizations which are held or used by the Company (the "Licenses"). All of the Licenses are in full force and effect, and the Company has not committed any violation of any License which has not been cured, and there are no proceedings pending for the revocation or limitation of any of the Licenses and no proceedings of this kind have been threatened. Except as set forth in the Disclosure Schedule, there are no material permits, licenses, franchises, zoning variances, or governmental approvals or authorizations which are necessary for the conduct of the business of the Company as now being conducted or as conducted at any time.

6.13    Litigation.  The Company is not subject to any court or administrative judgment, order, or decree affecting its business, the assets used in the operation of its business, or their right to carry on its business as conducted on the date of this Agreement. There is no litigation or arbitration proceeding, and there are no proceedings before any commission or other administrative or regulatory authority, pending against or affecting the business of the Company,

the assets used in the operation of the business of the Company, or the right of the Company to carry on its business as conducted on the date of this Agreement. No claim which has not ripened into litigation has been made or threatened against the Company, or against any stockholders of the Company, which might affect the business of the Company, the assets used in the operation of the business of the Company, or the right of the Company to carry on its business as conducted on the date of this Agreement, and no circumstances exist which might give rise to any claim of this kind.

6.14    <u>Corporate Acts</u>. All corporate acts required of the Company have been taken, and all reports and returns required to be filed by the Company with any governmental agency have been filed. The Company holds all of the permits, licenses, certificates, and other authorizations of federal, state, local, and foreign governmental agencies required for the conduct of its business.

6.15    <u>Retirement Plans</u>. The Company does not maintain any "employee pension benefit plans" within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), except for the Plan and the Roni Hicks & Associates Pension Incentive Plan (the "401(k) Plan"). To the knowledge of the Sellers, the Company has operated the Plan and the 401(k) Plan in substantial compliance with all applicable provisions of ERISA, of the Internal Revenue Code of 1986, as amended ("Code"), and of all other applicable laws, rules, and regulations. All reports required by any governmental agency with respect to the Plan and the 401(k) Plan have been filed on a timely basis.

6.16    <u>Authority</u>. The Company and the Sellers set forth in the first paragraph of this Agreement have the full right, power, and authority to carry out this Agreement in all respects and are not subject to any restriction or agreement which prohibits or would be violated by consummation of the transactions contemplated by this Agreement.

6.17    <u>Employee Relations</u>.

(a)    <u>No Collective Bargaining</u>. There are no collective bargaining or other labor or trade union agreements to which the Company is a party, and there are no labor, trade or collective bargaining agreements that pertain to any Company employees. There is no pending or, to the Company's knowledge, threatened union organization activity involving any of the Company's employees, nor has there ever been union representation involving any of the Company's employees.

(b)    <u>No Organized Labor Disputes</u>. There are, and for the past three years have been, no strikes, slowdowns, lockdowns, arbitrations, work stoppages or material grievances or other organized labor disputes or industrial action pending or, to the Company's knowledge, threatened or reasonably anticipated between the Company and any current or former Company employees or any union or other collective bargaining unit representing such employees.

(c)    <u>Compliance with Employment Laws.</u> The Company has complied in all material respects, and is in compliance in all material respects, with all laws relating to employment or the workplace, including laws relating to wages, hours, collective bargaining,

Case 20-90039-CL    Filed 02/27/20    Entered 02/27/20 11:37:41    Doc 1    Pg. 54 of 106

Exhibit B Page 54

safety and health, work authorization, equal employment opportunity, discrimination, immigration, withholding, unemployment compensation, unfair dismissal, worker's compensation, employee privacy and right to know.

6.18    Environmental Matters.    The Company is and has been for the last five years, in material compliance with all applicable Environmental Laws (defined below). The Company has not within the last five (5) years received any written request for information or notice with respect to the Company alleging or otherwise regarding any potential liability, noncompliance or any investigatory or remedial obligations arising under applicable Environmental Laws. The Company is in material compliance with all terms and conditions of all permits, licenses and other authorizations required pursuant to applicable Environmental Laws. The Company has at no time within the past five years and is not currently subject to any judicial or administrative proceeding regarding or alleging the violation of or liability under Environmental Laws. To Sellers' knowledge, there are no conditions, occurrences or activities that have given rise to material liability against the Company under any Environmental Laws. "Environmental Laws" shall mean all applicable foreign, federal, State or local statutes, laws, codes, rules, regulations, ordinances, orders, permits or licenses in effect as of the Closing Date pertaining to the protection, preservation, conservation or regulation of the environment.    The representations and warranties contained in this Section 6.18 are the sole and exclusive representations and warranties of the Sellers with respect to environmental matters.

6.19    Licenses, Patents, Trademarks.    The Company owns or has adequate rights to use all letters patent, patents, patent applications, patent and know-how licenses, trade names, trademark registrations and applications, common law trademarks, and copyright registrations and applications (collectively, the "Intangibles"), and all inventions, technology, processes, designs, know-how and formulae now or heretofore used in the conduct of its business, in each case free and clear of any and all liens, claims, pledges, encumbrances, charges, agreements, options or other restrictions.    To the best knowledge of the Sellers, the Company has not infringed and is not infringing and has not engaged in the unauthorized use or misappropriation of any Intangibles, invention, technology, process, design, computer program, know-how or formulae of another, and there are no actual or threatened claims or assertions against the Company relating thereto. To the best knowledge of Sellers, no Intangibles of the Company are being infringed by others.

6.20    Insurance.    The Trustee has been provided with a complete list of all binders, policies of insurance, self insurance programs or fidelity bonds ("Insurance") maintained by the Company or in which the Company is a named insured. All Insurance (i) has been issued by financially sound insurance companies under valid and enforceable policies or binders for the benefit of the Company, and all such policies or binders are in such types and full force and effect and are in amounts and for risks, casualties and contingencies customarily insured against by enterprises in operations similar to the Company; and (ii) satisfy contractual requirements (under the Company's Leases, loan agreements with its lender or otherwise) regarding the carrying of Insurance by the Company.    There are no pending or asserted claims against any Insurance as to which any insurer has denied liability and there are no claims under any Insurance that have been disallowed or improperly filed.    No notice of cancellation or nonrenewal with respect to, or material increase of premium for, any Insurance has been received by the Company.    To the knowledge of the Company, there has been no event which (a)

Exhibit B Page 54

reasonably might form the basis of any claim against the Company relating to the conduct or operations of the Company and which will materially increase the insurance premiums payable under any Insurance, or (b) otherwise will materially increase the insurance premiums payable under any Insurance.

6.21    Pre- and post-Transaction Solvency. The Company is and, after giving effect to the transactions contemplated by this Agreement, the Company's making of the ESOP and Seller Loans to the Trustee to enable the Trustee to purchase the Shares and the Company's receipt of loans from First American Bank for the purpose of, among others, funding the ESOP Loan, referred to herein as the "transactions contemplated by this Agreement"), will be: (a) in compliance with the requirements of Sections 500-509 of the California Corporations Code based on the most recent financial statements available to the Sellers at the time of Closing Date, (b) the Company's working capital is adequate to meet its current and projected obligations to creditors as and when they become due; and (c) the Company will not be left with an unreasonably small amount of capital with which to meet its obligations.

6.22    Disclosure. None of the representations or warranties made by the Sellers in this Agreement, and none of the statements made in the Disclosure Schedule or any document furnished pursuant to this Agreement, contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not misleading.

7.    Representations and Warranties of the Trustee. The Trustee hereby represents and warrants to the Sellers as follows:

7.1    Authority. On behalf of the Trust, the Trustee has the right, power, and authority to enter into this Agreement and to consummate the transaction contemplated by this Agreement. The signing, delivery, and performance of this Agreement by the Trustee have been duly and properly authorized, and this Agreement is valid and binding upon the Trust in accordance with its terms, except as limited by ERISA or by bankruptcy, insolvency, reorganization, or other laws affecting the enforcement of creditors' rights generally, and subject to the availability of equitable remedies.

7.2    No Conflicts. Neither the signing and delivery of this Agreement nor performance of this Agreement by the Trustee on behalf of the Trust will: (a) conflict with or result in the breach of the Trust, the Plan, or of any contract or agreement to which the Trustee is a party or by which it is bound; (b) require the Trustee to obtain the consent or approval of, or make any filing with, any person or public authority; or  (c) violate any law, regulation, judgment, or order binding upon the Trust.

7.3    Broker's Fees. The Trustee has not incurred any brokerage or finder's fees with respect to the transaction covered by this Agreement for which the Sellers may be liable.

7.4    Accuracy of Representations and Warranties. No representation, warranty, or covenant by the Trustee in this Agreement, and no certificate, schedule, or exhibit to this Agreement furnished or to be furnished by or on behalf of the Trustee, and no document or

certificate delivered to the Sellers pursuant to this Agreement or in connection with actions contemplated by this Agreement, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not misleading.

## CONDITIONS PRECEDENT TO CLOSING

8.    Conditions Precedent to the Obligations of the Trustee.  The obligations of the Trustee under this Agreement, including the obligation of the Trustee to close the transactions contemplated by this Agreement, are subject to the following conditions precedent:

(a)    Compliance with Obligations.  The Sellers and the Company shall have performed and complied with all of their obligations under this Agreement which are to be performed or complied with by them, including the delivery to the Trustee of the documents specified in this Agreement.

(b)    Disbursement of ESOP Loan.  The Company shall have made the ESOP Loan to the Trust.

(c)    Valuation Opinion.  The Trustee shall have obtained an opinion from Prairie Capital Advisors, Inc. that: (i) the purchase price for the Shares does not exceed the fair market value of the Shares; (ii) the interest rates on the ESOP Note and Seller Notes are reasonable; (iii) the terms of the ESOP Loan, the Seller Loans, the ESOP Note and the Seller Notes are as favorable to the Trust as the terms of a comparable loan resulting from arm's-length negotiations between independent parties; and (iv) the overall transaction contemplated by this Agreement is fair to the Trust from a financial point of view.  This opinion shall be dated as of the Closing Date.

(d)    Not a Prohibited Transaction.  The Trustee shall have determined that the purchase of the Shares is not imprudent.

(e)    Employment Agreements.  Todd Ochsner and Aaron Smith shall have entered into employment agreements in the forms attached to this Agreement as Exhibit "G".

9.    Conditions Precedent to Obligations of the Sellers.  The obligations of the Sellers under this Agreement, including their obligations to close the transactions contemplated by this Agreement, are subject to the condition that the Trustee shall have performed and complied with all of its obligations under this Agreement, including the delivery by the Trustee to the Sellers of the documents specified in this Agreement.

## DELIVERIES AT CLOSING

10.    Documents to be Signed and Delivered by the Company and the Trustee at Closing.  At the closing, the Company and the Trustee shall sign and deliver the ESOP Loan Agreement and the ESOP Pledge Agreement.

11.    Funds to be Delivered by the Company at Closing.  At the closing, the Company shall loan to the Trustee $6,448,978.00 by means of a wire transfer of funds to the Trustee.

12.    Documents to be Delivered by the Company and the Sellers at Closing.  At the closing, the Company and the Sellers shall deliver to the Trustee the following documents in form and substance acceptable to counsel for the Trustee:

(a)    the certificate or certificates representing the Shares, duly endorsed or accompanied by duly-signed stock powers for transfer to the Trustee;

(b)    copies of resolutions of the Board of Directors of the Company, certified by the Secretary of the Company as having been duly and validly adopted and as being in full force and effect, authorizing the following:  the signing and delivery of the ESOP Loan Agreement and of the ESOP Pledge Agreement; the approval of the external financing with First American Bank and the signing and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement; and

(c)    any other documents that the Trustee may reasonably request.

13.    Documents to be Signed and Delivered by the Sellers and the Trustee at Closing.  At the closing, the Sellers and the Trustee shall sign and deliver the Seller Loan Agreements and the Seller Pledge Agreements.  Also at the closing, the Trustee shall sign and deliver to the Company the ESOP Note, and sign and deliver to the Sellers the Seller Notes.

14.    Funds to be Delivered by the Trustee at Closing.  At the Closing, the Trustee shall pay to the Sellers $6,448,978.00 by means of a wire transfer of funds into checking accounts at depositories that shall be designated by the Sellers.

POST-CLOSING MATTERS

15.    Survival of Representations, Warranties, and Covenants.  The representations, warranties, covenants, agreements, and indemnities set forth in this Agreement or made pursuant to this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of any of the parties and shall survive for a period of twenty-four (24) months after the closing and transfers of the Shares pursuant to this Agreement ("Applicable Survival Period").

16.    Indemnification.  (a)  General.  Subject to the limitation set forth in subsection (b) below, the Sellers shall indemnify the Company and the Trustee for any loss, cost, expense, or other damage, including attorney's fees, suffered by the Company or by the Trustee resulting from, arising out of, or incurred with respect to: (i) the falsity or the breach of any representation, warranty, or covenant made by the Sellers in this Agreement; or (ii) any claim brought by any person relating to the business operations conducted by the Company prior to the Closing Date (collectively, "Indemnified Losses").

(b)    Limitation.  Notwithstanding any other provision of this Agreement to the contrary:

(i)    no Seller shall be liable for any Indemnified Losses relating to any breach of any representation or warranty (A) unless the claim for the Indemnified Losses is brought within the Applicable Survival Period, and (B) unless and until the aggregate amount of all Indemnified Losses incurred by the Trustee exceeds $85,000 (the "Basket Amount"), and once the Basket Amount is exceeded, all Indemnified Losses, including the Basket Amount, shall be recoverable; and

(ii)    the aggregate cumulative indemnification obligations of the Sellers under Section 16 shall in no event exceed $6,300,000.

The Trustee acknowledges and agrees that its sole and exclusive remedy with respect to any and all matters arising out of, relating to or connected with this Agreement against the Sellers and the Company, and their respective assets and liabilities (other than claims of, or causes of action arising from, fraud or intentional misrepresentation), shall be pursuant to the indemnification provisions set forth in this Section 16.

(c)    Notice.  The Company or the Trustee shall assert any right to indemnification by furnishing to the Sellers a written notice and list of charges detailed by item and showing the nature of any breach of any representation, warranty, or covenant or the nature of any other claim, the date of payment or assertion of a claim, a summary of settlement or litigation procedures, and the amount of the loss, cost, or expense.  If the right to indemnification of the Company or of the Trustee is based upon a claim of a third party, the Company or the Trustee shall give notice to the Sellers within 30 days after it receives notice of the claim; and the Sellers shall have the right to contest any claim by a third party.  The giving of notice by the Company or by the Trustee of one or more claims shall not preclude them from giving subsequent notices of other claims, whether arising before or after the claims of which prior notice has been given.

(d)    Arbitration.  If any claim by the Company or by the Trustee for indemnification against the Sellers is not settled within 90 days after notice of the claim is given to the Sellers, then the claim shall be submitted to arbitration in the manner provided in Section 26, provided, however, that if such claim arises from a claim of a third party, and Sellers have exercised its right to contest and is diligently contesting such claim, then such claim shall not be submitted to arbitration until the conclusion of such contest by Sellers.

## COVENANTS OF THE COMPANY AND SELLERS

The Company hereby covenants and agrees with the Sellers and the Trustee as follows:

17.    Maintenance of Company and Workforce.  The Company will maintain its existence so long as the Plan is in effect and, unless severely adverse business conditions develop, will not materially decrease the size of its workforce in a manner that would inhibit the allocation of the Shares to the participants in the Plan.

18.    Maintenance of the Plan.  Subject to the right of the Company to amend or terminate the Plan in accordance with the terms of the Plan, the Company will take all actions within its power to preserve the existence of the Plan and Trust and maintain their tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code.  The Company shall

administer the Plan in compliance with (a) the Code and ERISA, as applicable to the Plan and this Agreement, and (b) all other laws and regulations applicable to the Plan and the Trust.

19.    <u>Contributions to the Plan</u>.  For as long as the ESOP Note or any Seller Note is outstanding, the Company will make contributions to the Plan in amounts which are sufficient, when combined with dividends paid on the shares of Company stock held by the Trust, to enable the Trustee to pay, on a timely basis, all interest and principal due on the ESOP Note, Seller Notes, and the promissory note, dated March 13, 2014, issued by the Trust in favor of the Company in the original principal amount of $5,350,000.

20.    <u>Covenant Not to Compete</u>.  During the term of each Seller's employment with the Company and for a period of two years following the termination of her employment with the Company, the Seller shall not, directly or indirectly, compete with, or attempt to compete with, the Company or contract with any customers of the Company for her own interest or otherwise. For purposes of this Agreement, the covenant given by the Seller under this Section 20 shall be referred to as the "Non-Compete Covenant."  The Company and the Sellers acknowledge that the Non-Compete Covenant has been provided as consideration in connection with the sale of the Shares pursuant to this Agreement.

21.    <u>Price Protection</u>.

(a)    To mitigate the impact of the Transaction on the value of shares of Company stock allocated to certain participants in the Plan ("Protected Participants"), the Company and the Trustee agree to establish a floor price for said shares held by the Trust immediately prior to the Closing Date ("Pre-Closing Shares"), pursuant to the provisions of this Section 21. For purposes of this Section 21, the term "Protected Participants" means Plan participants who are (1) already receiving Pre-Closing Shares in installment distributions under the Plan prior to the Closing Date, (2) receiving distributions of Pre-Closing Shares on or after the Closing Date and during the "Distribution Period" (defined below) in connection with a Protected Participant's death, termination of employment after his or her "Retirement Date" (as defined in the Plan), or involuntary termination unrelated to job performance or other malfeasance on the part of Protected Participant, or (3) receiving Pre-Closing Shares pursuant to the required minimum distribution rules under Section 401(a)(9) of the Code during the Distribution Period.

(b)    Distributions made from the Plan to Protected Participants on or before the fifth (5th) anniversary of the Closing Date (the "Distribution Period") will be made in the form of Company shares.  When Protected Participants put Pre-Closing Shares to the Company, the Company shall pay a per-share purchase price ("Price Protected Amount") equal to the per-share value of a Company share under the Plan determined by the Trustee as of the last day of the Plan year immediately preceding the Plan year of distribution, as adjusted pursuant to Section 21(c) below.

(c)    The Price Protected Amount for any Pre-Closing Shares subject to Section 21 will be determined by taking the Company share value as of the prior Plan year end and adjusting the value to eliminate the interest bearing debt taken on by the Company and the Trust to fund the Transaction contemplated under this Agreement.

DB1/ 90455415.7

- 12 -

22.    <u>Composition of Board of Directors</u>.  Within six months following the Closing Date, the Company will nominate an "Independent Member" (as defined below) for its Board of Directors, who shall be presented to the Trustee for its consideration and vote.  Within twelve months following the Closing Date, the Company will nominate a second Independent Member for its Board of Directors, who shall be presented to the Trustee for its consideration and vote. For purposes of this Agreement, "Independent Member" means an individuals who is not a (a) current or former employee of the Company, and (b) family member of any current or former employee.

23.    <u>S-Corporation Election</u>. The Company and the Trustee shall take, or cause to be taken, all actions reasonably necessary to for the Company to qualify to be taxed as an S Corporation effective as of January 1, 2019.  The Company, the Trustee, and each Seller shall not take any action that would cause the Company to cease to qualify as an S corporation on or after January 1, 2019.

24.    <u>Refinance of Seller Notes</u>.  The Company agrees to use commercially reasonable efforts to refinance the balance of the Seller Notes no later than January 31, 2019.

MISCELLANEOUS

25.    <u>Arbitration</u>.  Any controversy or claim arising out of or relating to this Agreement or any alleged breach of this Agreement shall be settled by arbitration in San Diego, California in accordance with the rules of the American Arbitration Association then in force, except that a written opinion of the arbitrators must be delivered to the parties notwithstanding any rules to the contrary. Three arbitrators shall be selected to settle the controversy or claim, with the Trustee nominating one arbitrator, the Sellers nominating the second arbitrator, and the first and second arbitrators jointly nominating the third arbitrator.  The arbitrators shall be persons experienced in negotiating and in making and consummating stock purchase agreements on behalf of employee stock ownership plans.  A judgment upon the award entered by the majority of the arbitrators shall be entered in any court having jurisdiction. Subject to the requirements of, and restrictions contained in ERISA, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in any arbitration or court proceeding.

26.    <u>Notice</u>.  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be delivered in person or sent by certified mail, postage prepaid, or by private express mail, and properly addressed as follows:

TO THE SELLERS:                Jane Carey Wheeler and Stephen W. Wheeler
                               1206 Caminito Graciela
                               Encinitas, CA 92024

                               Diane L. Gaynor-McCue and Steven F. McCue
                               2901 Amigo Drive
                               Lake Havasu City, Arizona 86404

with a copy to:                Morgan, Lewis & Bockius LLP

DB1/ 90455415.7                        - 13 -

77 West Wacker Drive
Chicago, Illinois 60601
Attention: Brian Hector

TO THE COMPANY:                  Roni Hicks & Associates
11682 El Camino Real
San Diego, California 92130
Attention: President

with a copy to:                  Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, Illinois 60601
Attention: Brian Hector

TO THE TRUSTEE:                  First Bankers Trust Services, Inc.
2321 Kochs Lane
Quincy, Illinois 62305-4005
Attention: Roni Hicks & Associates Account
Officer

with a copy to:                  Schatz Brown Glassman LLP
1007 Farmington Avenue – Suite 4
West Hartford, CT 06107
Attention: Robert Schatz

Any notice, request, or communication, if given by registered or certified letter or by private express mail, shall be deemed to have been given when deposited in the United States mails or with the private express mail delivery service, postage prepaid; and if given otherwise than by registered or certified letter or by private express mail, then the notice, request, or communication shall be deemed to have been given when received. Failure to give or receive copies of notices shall not be deemed to be a failure to give notice.

27.    Expenses.  The Sellers shall be responsible for the fees and expenses incurred by them in connection with the transactions contemplated by this Agreement, and the Company shall be responsible for all fees and expenses incurred by the Trustee and the Company in connection with this transaction.

28.    Governing Law.  This Agreement shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of Illinois.

29.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

30.    Waivers.  Any party may, by written notice to another party:  (a) extend the time for the performance of any of the obligations or other actions of the other party under this Agreement; (b) waive any inaccuracies in the representations or warranties of any other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive

compliance with any of the conditions or covenants of any other party contained in this Agreement; or (d) waive or modify performance of any of the obligations of any other party under this Agreement. Except as provided in the preceding sentence, no action taken pursuant to this Agreement including, without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking the action of compliance with any representations, warranties, covenants, or agreements contained in this Agreement. The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

   31. <u>Entire Agreement</u>. This Agreement supersedes all prior agreements and understandings between the parties and may not be changed or terminated orally, and no attempted change, termination, or waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by the party against whom the change, termination, or waiver is sought to be enforced.

   32. <u>Counterparts</u>. This Agreement may be signed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

   33. <u>Action as Trustee</u>. First Bankers Trust Services, Inc. has signed and delivered this Agreement solely as Trustee of the Trust, and not in any individual capacity or in its corporate capacity. The performance of this Agreement by the Trustee, and all duties, obligations, and liabilities of the Trustee under this Agreement, will be undertaken by First Bankers Trust Services, Inc. only in its capacity as the Trustee of the Trust. First Bankers Trust Services, Inc. does not undertake any individual liability or obligation by virtue of the signing and delivery of this Agreement or by reason of the representations, warranties, and covenants contained in this Agreement.

[Signature Page Follows.]

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first above written.

SELLERS:

THE COMPANY:
INTEGRATEDMARKETING.COM

_____
Jane Carey Wheeler, as wife

By: _____
Its: _____

_____
Stephen W. Wheeler, as husband

_____
Diane L. Gaynor-McCue, as wife

_____
Steven F. McCue, as husband

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

_____

[Signature Page to Stock Purchase Agreement]

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first above written.

SELLERS:                                    THE COMPANY:
                                            INTEGRATEDMARKETING.COM

_____             By:_____
Jane Carey Wheeler, as wife                     Its:_____

_____
Stephen W. Wheeler, as husband

_____
Diane L. Gaynor-McCue, as wife

_____
Steven F. McCue, as husband                 TRUSTEE: First Bankers Trust Services, Inc.,
                                            not in any individual capacity or in its
                                            corporate capacity, but solely as Trustee of the
                                            Roni Hicks & Associates Employee Stock
                                            Ownership Trust

                                            _____

[Signature Page to Stock Purchase Agreement]

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first above written.

SELLERS:

THE COMPANY:
INTEGRATEDMARKETING.COM

_____
Jane Carey Wheeler, as wife

By:_____
   Its:_____

_____
Stephen W. Wheeler, as husband

_____
Diane L. Gaynor-McCue, as wife

_____
Steven F. McCue, as husband

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

*First Bankers Trust Services, Inc.*

[Signature Page to Stock Purchase Agreement]

# EXHIBIT C

Exhibit C Page 66

*EXECUTION VERSION*

**AMENDMENT NO. 1 to the**
**STOCK PURCHASE AGREEMENT**

**June 21, 2019**

**WHEREAS**, as of June 30, 2017, that certain STOCK PURCHASE AGREEMENT (the "Agreement") was entered into, by and among (i) JANE CAREY WHEELER, STEPHEN W. WHEELER, DIANE L. GAYNOR-McCUE, and STEVEN F. McCUE (collectively, the "Sellers"), INTEGRATED MARKETING.COM (D/B/A RONI HICKS & ASSOCIATES) (the "Company") and FIRST BANKERS TRUST SERVICES, INC. (the "First Bankers"). Each of First Bankers, or as the case may be, the successor Trustee as defined below, the Company, and the Sellers shall be referred to as a "Party" or collectively, the "Parties".

**WHEREAS**, the Parties desire to amend the Agreement to extend the allowable time to bring a claim for an Indemnified Loss as defined under the Agreement.

**WHEREAS**, Section 31 of the Agreement states that a provision of the Agreement may be amended so long as such change is made in writing and signed by the Party against whom such change is sought to be enforced.

**WHEREAS**, the Board of Directors of the Company resolved on May 1, 2019 to appoint Miguel Paredes as sole and successor Trustee ("Trustee") of the Roni Hicks & Associates Employee Stock Ownership Plan, and Miguel Paredes agreed to serve as successor Trustee of the ESOP pursuant to the terms of that certain Engagement Agreement by and between the Company and Miguel Paredes dated May 1, 2019.

**NOW, THEREFORE**, the Agreement is amended as follows, effective as of the execution date of the Sellers as set forth on the signature page bellow:

**Section 16(b)(i)(A) is amended by replacing "within the Applicable Survival Period" with "no later than September 30, 2019". The remainder of Section 16(b) shall otherwise remain the same.**

*[Signature page to follow]*

To record the adoption of this Amendment No. 1 to the Agreement, the Parties have executed it this 21st day of June 2019.

INTEGRATED MARKETING.COM     TRUSTEE:
(D/B/A RONI HICKS & ASSOCIATES

By:_____     _____
Its:_____     Miguel Paredes, not in his individual capacity, but solely as Trustee

SELLERS:
_____
JANE CAREY WHEELER, as wife

_____
STEPHEN W. WHEELER, as husband

_____
DIANE L. GAYNOR-McCUE, as wife

_____
STEVEN F. McCUE, as husband

Exhibit C Page 67

To record the adoption of this Amendment No. 1 to the Agreement, the Parties have executed it this 21ST day of June 2019.

**INTEGRATED MARKETING.COM**
**(D/B/A RONI HICKS & ASSOCIATES**

By:_____
Its:_____

**TRUSTEE:**

_____
Miguel Paredes, not in his individual capacity, but solely as Trustee

**SELLERS:**

_____
JANE CAREY WHEELER, as wife

_____
STEPHEN W. WHEELER, as husband

_____
DIANE L. GAYNOR-McCUE, as wife

_____
STEVEN F. McCUE, as husband

-2-

Exhibit C Page 68

To record the adoption of this Amendment No. 1 to the Agreement, the Parties have executed it this 21ST day of June 2019.

**INTEGRATED MARKETING.COM
(D/B/A RONI HICKS & ASSOCIATES**

By:_____
Its:_____

**TRUSTEE:**

_____
Miguel Paredes, not in his individual capacity, but solely as Trustee

**SELLERS:**

_____
JANE CAREY WHEELER, as wife

_____
STEPHEN W. WHEELER, as husband

_____
DIANE L. GAYNOR-McCUE, as wife

_____
STEVEN F. McCUE, as husband

-2-

Exhibit C Page 69

To record the adoption of this Amendment No. 1 to the Agreement, the Parties have executed it this 21ST day of June 2019.

**INTEGRATED MARKETING.COM**
**(D/B/A RONI HICKS & ASSOCIATES**

By: _____
Its: _____

**TRUSTEE:**

_____
Miguel Paredes, not in his individual capacity, but solely as Trustee

**SELLERS:**

_____
JANE CAREY WHEELER, as wife

_____
STEPHEN W. WHEELER, as husband

_____
DIANE L. GAYNOR-McCUE, as wife

_____
STEVEN F. McCUE, as husband

-2-

Exhibit C Page 70

# EXHIBIT D

*Execution Version*

## ESOP LOAN AGREEMENT

This ESOP Loan Agreement ("Agreement"), dated June 30, 2017, is by and between INTEGRATEDMARKETING.COM, a California corporation d/b/a Roni Hicks & Associates (the "Company"), and First Bankers Trust Services, Inc., an Illinois corporation, not in its corporate capacity, but solely in its capacity as trustee of the Roni Hicks & Associates Employee Stock Ownership Trust.

## RECITALS

The Company has established an employee stock ownership plan for the benefit of its employees, known as the "Roni Hicks & Associates Employee Stock Ownership Plan" (the "Plan"). The Company also has established a trust as the funding vehicle for the Plan, known as the "Roni Hicks & Associates Employee Stock Ownership Trust" (the "Trust"). The Company has appointed First Bankers Trust Services, Inc. to serve as the trustee of the Trust. The Plan is designed to invest primarily in stock of the Company, and the trustee of the Trust is authorized to borrow funds to finance the purchase of Company stock.

The trustee of the Trust has determined that it is in the best interests of the participants in and beneficiaries of the Plan to purchase 51,000 shares of the Company's common stock (the "Shares") from the shareholders of the Company pursuant to the terms of a Stock Purchase Agreement dated the date of this Agreement. The Company has agreed to lend $6,448,978.00 to the Trust for the purpose of providing the funds to purchase 39,155 of the Shares using the proceeds of the ESOP Loan (the "Pledged Shares"). The loan is intended to be an "exempt loan," as described in Section 4975(d)(3) of the Internal Revenue Code of 1986, Section 54.4975-7(b) of the Treasury Department Regulations, Section 408(b)(3) of the Employee Retirement Income Security Act of 1974, and Section 2550.408b-3 of the Department of Labor Regulations.

Therefore, in consideration of the terms and conditions contained in this Agreement, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following words and phrases shall have the following meanings:

1.1    "Bank" shall mean First American Bank, an Illinois banking corporation.

1.2    "Bank Loan Agreement" shall mean the Loan and Security Agreement between the Bank and the Company, dated the date of this Agreement, pursuant to which the Bank agreed to lend the Company $7,850,000.

1

1.3    "Code" shall mean the Internal Revenue Code of 1986, as amended.

1.4    "Company" shall have the meaning set forth in the Preamble to this Agreement.

1.5    "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

1.6    "ESOP Loan" shall have the meaning set forth in Section 2.1 of this Agreement.

1.7    "ESOP Loan Documents" shall mean this Agreement, the ESOP Note, and the Stock Pledge Agreement.

1.8    "ESOP Note" shall mean the promissory note signed by the Trustee and delivered to the Company to evidence the ESOP Loan.

1.9    "Exempt Loan Rules" shall mean the rules set forth in Section 4975(d)(3) of the Code, Section 54.4975-7(b) of the Treasury Department Regulations, Section 408(b)(3) of ERISA, and Section 2550.408b-3 of the Department of Labor Regulations.

1.10    "Plan" shall have the meaning set forth in the Recitals to this Agreement.

1.11    "Pledged Shares" shall have the meaning set forth in the Recitals to this Agreement.

1.12    "Shares" shall have the meaning set forth in the Recitals to this Agreement.

1.13    "Stock Pledge Agreement" shall mean the agreement between the Trustee and the Company, dated the date of this Agreement, pursuant to which the Trustee has agreed to pledge the Pledged Shares to the Company to secure the obligations of the Trust under this Agreement.

1.14    "Trust" shall have the meaning set forth in the Recitals to this Agreement.

1.15    "Trustee" shall mean First Bankers Trust Services, Inc. or any other person who shall be duly appointed to serve with or to succeed First Bankers Trust Services, Inc. as trustee of the Trust.

ARTICLE II
LOAN

2.1    Amount of Loan.  The Company agrees to lend to the Trust the sum of $6,448,978.00 (the "ESOP Loan").  The Company's obligation to make this loan is subject

to the condition that the Company first shall have received a loan in the amount of at least $6,448,978.00 from the Bank, as provided for in the Bank Loan Agreement.

2.2    Use of Loan Proceeds.  The Trustee shall use the proceeds of the ESOP Loan solely for the purpose of purchasing the Pledged Shares.

2.3    ESOP Note.  Upon receipt of the proceeds of the ESOP Loan, the Trustee will sign the ESOP Note and deliver it to the Company.

2.4    Payment of ESOP Note.  The ESOP Loan is intended to be an "exempt loan" within the meaning of the Exempt Loan Rules.  Accordingly, repayment by the Trust of the principal amount of the ESOP Loan, and payment by the Trust of interest on the ESOP Loan, shall be made only from the following sources:  (a) contributions made by the Company to the Trust to enable the Trustee to repay the ESOP Loan; (b) earnings attributable to the investment of those contributions; (c) any dividends, earnings, or distributions on the Pledged Shares held in the Trust; and (d) proceeds from the sale of any Pledged Shares held by the Company pursuant to the Stock Pledge Agreement.  The Company shall have no recourse to any other assets of the Trust for repayment of the ESOP Loan.

2.5    Prepayment.  The Trust may prepay all or any portion of the ESOP Loan at any time without penalty or premium.   Payments received by the Company from the Trust on the ESOP Note shall be applied as set forth in the ESOP Note.


ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE TRUSTEE

On behalf of the Trust, the Trustee hereby represents and warrants to the Company as follows:

3.1    Authority.  The Trustee has full power and authority under the Plan to sign and deliver the ESOP Loan Documents and to consummate the transactions contemplated by these documents.  The ESOP Loan Documents have been duly authorized, signed, and delivered by the Trustee on behalf of the Trust. The ESOP Loan Documents constitute legal, valid, and binding obligations of the Trust, enforceable against the Trust in accordance with their terms, except as they may be limited by ERISA and by bankruptcy, insolvency, reorganization, or other laws affecting the enforcement of creditors' rights generally.

3.2    No Conflicts.  The signing, delivery, and performance of the ESOP Loan Documents by the Trustee on behalf of the Trust, and the consummation of the transactions contemplated by the ESOP Loan Documents, do not and will not:  (a) require the consent or approval of, or the filing of any documents with, any person or governmental authority; (b) constitute or result in the breach of any provision of, or constitute a default under, the Plan or any agreement known to the Trustee or to which

3

the Trust is a party or by which it or its assets may be bound; or (c) violate any law, regulation, judgment, or order binding upon the Trust or give rise to any liability to the Trust under Title I of ERISA or Section 4975 of the Code.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the Trustee and to the Trust as of the date of this Agreement as follows:

4.1    Organization of Plan.    The Plan has been properly established in accordance with all applicable laws, regulations, and rulings, and the Plan is an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code.

4.2    Terms of Loan.    The terms, conditions, and interest rate of the ESOP Loan are at least as favorable to the Plan as the terms of a comparable loan resulting from arm's-length negotiations between independent parties.

4.3    Authority.    The Company has all required corporate power and authority to enter into, deliver, and perform its obligations under this Agreement.    The signing, delivery, and performance of this Agreement have been duly authorized by all necessary corporate action on the part of the Company.    This Agreement has been duly signed and delivered by the Company, and the obligations of the Company under this Agreement are valid, legally binding, and enforceable against the Company in accordance with the terms of this Agreement, except as they may be limited by bankruptcy, insolvency, reorganization, or other laws affecting the enforcement of creditors' rights generally.

4.4    No Conflicts.    The signing, delivery, and performance of this Agreement and of the Stock Pledge Agreement by the Company does not and will not:  (a) require the consent or approval of, or the filing of any documents with, any person or governmental authority; (b) conflict with or result in any violation of, or a default under, any provision of the articles of incorporation or by-laws of the Company or of any agreement to which the Company is a party or by which it or any of its properties are bound; or (c) violate any law, regulation, judgment, or order applicable to the Company.

4.5    Litigation Against the Plan or the Trust.    There is no action or proceeding pending or, to the Company's knowledge, threatened against the Plan or the Trust before any court or administrative agency.

4

ARTICLE V
COVENANTS OF THE COMPANY

The Company hereby covenants and agrees with the Trustee and the Trust as follows:

5.1    Maintenance of Company and Workforce.  The Company will maintain its existence and, unless severely adverse business conditions develop, will not materially decrease the size of its workforce in a manner that would inhibit the allocation of the Pledged Shares to the participants in the Plan.

5.2    Maintenance of Plan.  Subject to the right of the Company to amend or terminate the Plan in accordance with the terms of the Plan, the Company will take all actions within its power to preserve the existence of the Plan and of the Trust and to maintain their tax-qualified status under Sections 401(a) and 501(a), respectively, of the Code.  The Company shall administer the Plan in material compliance with (a) the Code and ERISA, as applicable to the Plan and this Agreement, and (b) all other laws and regulations applicable to the Plan and to the Trust.

5.3    Contributions to the Plan.  For as long as the ESOP Note is outstanding, the Company will make contributions to the Plan or pay distributions or declare dividends on the Pledged Shares in amounts which are sufficient to enable the Trustee to pay all interest and principal due on the ESOP Note when due.

ARTICLE VI
DEFAULT

6.1    Event of Default.  The failure of the Trust to pay when due any principal, interest, or other amounts due and payable under the ESOP Note or under this Agreement shall be an "Event of Default," unless the reason for the failure of the Trust to pay the amount due is that the Company has failed to make the contributions or distributions or to declare the dividends required from it pursuant to the terms of the Plan and pursuant to the terms of Section 5.3 of this Agreement.

6.2    Remedies.  Upon the occurrence and during the continuance of an Event of Default, the Company shall be entitled to exercise all rights and remedies under the Stock Pledge Agreement and all rights and remedies available to a creditor to recover from the Trust (a) dividends or distributions paid to it by the Company and held by the Trustee and cash contributions made by the Company to the Trust to enable the Trust to meet its obligations under this Agreement and under the ESOP Note (provided that the dividends, distributions, and contributions have not been so applied by the Trust), (b) all earnings attributable to the Pledged Shares held in the Trust and to the investment of the cash contributions, and (c) proceeds from the sale of any Pledged Shares held by the Company pursuant to the Stock Pledge Agreement.  In no event shall there be an acceleration of payments not yet due and payable under this Agreement or under the

5

ESOP Note, and the Company shall not be entitled to recover, as a result of an Event of Default, assets with a value in excess of the amount in default, and the payment or reimbursement to the Company, or any holder of this Agreement or the ESOP Note, of collection costs or attorney fees are not permitted. Assets of the Trust shall be transferred to the Company after an Event of Default only to the extent of the failure of the Trust to meet the payment schedule set forth in the ESOP Note. For purposes of this Section 6.2, the dollar amount of a default shall be equal to the difference between (i) the aggregate amount of principal and accrued interest which was due and payable on the ESOP Note as of the date of the Event of Default, and (ii) the aggregate amount paid to the Company by the Trust at the time of the Event of Default.

ARTICLE VII
MISCELLANEOUS

7.1    Notices.   All notices that are required under this Agreement shall be in writing and shall be delivered personally, by facsimile, by private express mail, or by registered or certified U.S. mail, postage or other fees prepaid, addressed as follows:

TO THE COMPANY:

> Roni Hicks & Associates
> 11682 El Camino Real
> San Diego, California 92130
> Attention: President

with a copy to:

> Morgan, Lewis & Bockius LLP
> 77 West Wacker Drive
> Chicago, Illinois 60601
> Attention: Brian Hector

TO THE TRUSTEE:

> First Bankers Trust Services, Inc.
> 2321 Kochs Lane
> Quincy, Illinois 62305-4005
> Attention: Roni Hicks & Associates
> Account Officer

with a copy to:

> Schatz Brown Glassman LLP
> 1007 Farmington Avenue – Suite 4
> West Hartford, CT 06107
> Attention: Robert Schatz

7.2    Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns. The Company shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Trustee. The Trustee shall have the

right to assign its rights and obligations under this Agreement to any successor trustee of the Trust with the prior written consent of the Company.

      7.3    <u>Survival of Representations and Warranties</u>. All of the representations and warranties made by the parties in this Agreement shall survive the disbursement and closing of the ESOP Loan.

      7.4    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties relating to the ESOP Loan, and it may not be changed or terminated orally. No attempted change, termination, or waiver of any of the provisions of this Agreement shall be binding unless in writing and signed by the party against whom the change, termination, or waiver is sought to be enforced.

      7.5    <u>Severability</u>. Any portion of this Agreement which a court of competent jurisdiction shall determine to be void or unenforceable against public policy or for any other reason shall be deemed to be severable from this Agreement and shall have no effect on the other covenants or provisions in this Agreement. The parties to this Agreement agree that the court shall be empowered to reform and construe any provision which would otherwise be void or unenforceable in a manner that will be valid and enforceable to the maximum extent permitted by law.

      7.6    <u>Governing Law</u>. This Agreement shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of Illinois.

      7.7    <u>Action Taken as Trustee</u>. The Company hereby expressly acknowledges and agrees that this Agreement and the ESOP Note are being signed by the Trustee not in its corporate capacity, but solely in its capacity as trustee of the Trust, and that the obligations of the Trustee under this Agreement and under the ESOP Note are without personal recourse against the Trustee.

      7.8    <u>Counterparts</u>. This Agreement may be signed in one or more counterparts and by pdf or facsimile signature, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

      7.9    <u>Compliance with Federal Law and Regulations</u>. The ESOP Loan Documents are intended to comply with ERISA, the Code, and the regulations issued thereunder, as in effect on the date of this Agreement. To the extent that there shall be any inconsistency between the provisions under those statutes or regulations and the terms of this Agreement, the statutes or regulations shall govern and shall supersede any inconsistent provisions of this Agreement.

[Signatures appear on the following page]

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first written above.

THE COMPANY:
INTEGRATEDMARKETING.COM

By: _____

Its: _____

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

_____

*Signature Page to ESOP Loan Agreement*

IN WITNESS WHEREOF, the parties have signed this Agreement as of the day and year first written above.

THE COMPANY:
INTEGRATEDMARKETING.COM

By:_____
    Its: _____

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

*First Bankers Trust Services, Inc.*

*Signature Page to ESOP Loan Agreement*

*Execution Version*

## ESOP STOCK PLEDGE AGREEMENT

This ESOP Stock Pledge Agreement ("Agreement") is made and entered into as of the 30th day of June, 2017, by and between INTEGRATEDMARKETING.COM, a California corporation d/b/a Roni Hicks & Associates (the "Company"), and First Bankers Trust Services, Inc. ("Trustee"), an Illinois corporation, not in its corporate capacity, but solely in its capacity as trustee of the Roni Hicks & Associates Employee Stock Ownership Trust ("Trust").

### RECITALS

The Company has made a loan to the Trust in the amount of $6,448,978.00 to fund in part the purchase by the Trust of 51,000 shares of common stock of the Company (the "Shares"). To evidence the indebtedness of the Trust to the Company, the Trustee has signed and delivered to the Company a promissory note, dated the date of this Agreement, in the principal amount of $6,448,978.00 (the "Note"). The terms of the loan evidenced by the note are set forth in a loan agreement, dated the date of this Agreement, between the Company and the Trust. The Shares have been obtained by the Trustee for the benefit of the participants in and beneficiaries of the Roni Hicks & Associates Employee Stock Ownership Plan (the "Plan"). To secure the obligations of the Trust to repay the Note, the Trustee has agreed to pledge 39,155 Shares (the Pledged Shares") to the Company.

### AGREEMENT

Therefore, in consideration of the terms and conditions contained in this Agreement, the Trustee and the Company hereby agree as follows:

1.    Stock Pledge.    The Trustee hereby grants a security interest in and delivers to the Company the Pledged Shares, represented by certificate no. 12 (the "Pledged Stock"), together with a duly-signed stock power, subject to the provisions of Paragraph 3. The Company hereby accepts delivery of the Pledged Stock, subject to the terms and provisions of this Agreement.

2.    Term.    Subject to the provisions of Section 3 of this Agreement, the Pledged Stock shall remain pledged to the Company until all obligations of the Trustee under the Note and under this Agreement are fully satisfied.

3.    Annual Release of the Pledged Stock.    For each fiscal year of the Plan, the Company shall release and deliver to the Trustee that percentage of the Pledged Stock equal to a fraction, the numerator of which is the amount of principal and interest paid or accrued on the Note for a particular fiscal year of the Plan, and the denominator of which is the sum of the numerator plus the principal and interest to be paid on the Note for all future fiscal years of the Plan. If the rate of interest payable under the Note is variable, the interest rate to be paid in future years shall be assumed to be equal to the interest

rate applicable as of the last day of the fiscal year of the Plan for which a calculation is being made.

4.    <u>Books and Records</u>.  The Trustee shall separately account in the books and records of the Trust for (a) contributions made to the Plan by the Company to enable the Trust to meet its obligations under the Note, and (b) the earnings attributable to the investment of those contributions and to the Pledged Stock.

5.    <u>Limitations on Payments</u>.  The payments to be made on the Note during any fiscal year of the Plan shall not exceed an amount equal to (a) the sum of the contributions made by the Company to the Plan during that year and during all prior years to enable the Trust to repay the Note, plus the earnings attributable to the investment of those contributions and the earnings attributable to the Pledged Stock (including the proceeds from the sale of any shares of the Pledged Stock), less (b) all payments made by the Trust under the Note in prior years.

6.    <u>Rights With Respect to the Pledged Stock</u>.  Legal title to the Pledged Stock shall remain in the Trust during the term of this Agreement.  The Company shall hold the Pledged Stock as security for the payments due under the Note.  For so long as the Trust is not in default in the performance of any of its obligations under the terms of the Note, the Trustee shall have all of the rights and privileges incident to the ownership of the Pledged Stock (including, but not limited to, the rights to vote the shares of the Pledged Stock and to receive any dividends or other distributions with respect to the shares of the Pledged Stock).

7.    <u>Return of the Pledged Stock</u>.  When the Note has been fully paid and discharged, the Company shall deliver to the Trustee all of the shares of the Pledged Stock which have not been previously released to the Trust pursuant to Section 3 of this Agreement.

8.    <u>Substitution of the Pledged Stock</u>.  If the Company is merged or liquidated into another corporation, the Company shall surrender the Pledged Stock to the corporation into which the Company is merged or liquidated in exchange for shares of that corporation and shall continue to comply with the provisions of this Agreement.

9.    <u>Default and Remedies</u>.  If the Trust shall fail to make any payment under the Note when due and payable, the Company then shall have the right to foreclose upon the Pledged Stock and shall have all of the rights, obligations, and privileges with respect to the Pledged Stock that are accorded to a secured party under the Uniform Commercial Code or any other applicable law in force in the State of Illinois (to the extent permitted under Treasury Regulations section 54.4975-7); *provided, however,* that the payment or reimbursement to the Company, or any holder of this Agreement or the Pledged Stock, of collection costs or attorney fees are not permitted. However, the value of the Pledged Stock foreclosed upon by the Company may not exceed the amount that is past due under the terms of the Note.

10.     <u>No Recourse Against the Plan</u>.  The Note is without recourse against either the Trust or the Plan.

11.     <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties concerning the pledge of the Pledged Shares, and it shall not be modified, altered, or amended except in writing signed by both the Trustee and the President of the Company.

12.     <u>Severability</u>.  Any portion of this Agreement which a court of competent jurisdiction shall determine to be void or unenforceable against public policy or for any other reason shall be deemed to be severable from this Agreement and shall have no effect on the other covenants or provisions in this Agreement.  The parties to this Agreement agree that the court shall be empowered to reform and construe any provision which would otherwise be void or unenforceable in a manner that will be valid and enforceable to the maximum extent permitted by law.

13.     <u>Governing Law</u>.  This Agreement shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of Illinois.

14.     <u>Counterparts</u>.  This Agreement may be signed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

15.     <u>Compliance with Federal Law and Regulations</u>.  This Agreement is intended to comply with ERISA, the Code, and the regulations issued thereunder, as in effect on the date of this Agreement.  To the extent that there shall be any inconsistency between the provisions under those statutes or regulations and the terms of this Agreement, the statutes or regulations shall govern and shall supersede any inconsistent provisions of this Agreement.

[Signatures appear on the following page]

IN WITNESS WHEREOF, the Trustee and the Company have signed this ESOP Stock Pledge Agreement as of the date first written above.

THE COMPANY:
INTEGRATEDMARKETING.COM

By:_____

Its:_____

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

_____

*Signature Page to ESOP Stock Pledge Agreement*

IN WITNESS WHEREOF, the Trustee and the Company have signed this ESOP Stock Pledge Agreement as of the date first written above.

THE COMPANY:
INTEGRATEDMARKETING.COM

By:_____
    Its: _____

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

*First Bankers Trust Services, Inc.*

*Signature Page to ESOP Stock Pledge Agreement*

*Execution Version*

## ESOP NOTE

$6,448,978.00                                                    San Diego, California
                                                                June 30, 2017

FOR VALUE RECEIVED, the undersigned, Roni Hicks & Associates Employee Stock Ownership Trust (the "Borrower"), hereby unconditionally promises to pay to the order of INTEGRATEDMARKETING.COM, a California corporation d/b/a Roni Hicks & Associates (the "Lender"), at its office at 11682 El Camino Real, San Diego, California 92130, or at any other place that the holder of this ESOP Note (this "Note") may designate from time to time in writing, the sum of $6,448,978.00 (the "Principal Amount") together with all accrued interest thereon, as provided in this Note.

Beginning on December 31, 2017 and ending on December 31, 2030, on December 31 of each year, the Borrower shall pay to the Lender in cash interest on the principal balance of this Note remaining unpaid at a rate equal to 2.68% per year.

Beginning on December 31, 2031, on December 31 of each year, the Borrower shall pay to the Lender in cash, equal payments of principal and interest based on a 16 year straight amortization of the Principal Amount and interest at a rate equal to 2.68% per year, with a final payment of all outstanding principal and accrued interest due on December 31, 2046. An amortization schedule is attached to this Note as Exhibit A.

This Note evidences a loan made pursuant to an ESOP Loan Agreement between the Lender and the Borrower dated the date of this Note (the "Loan Agreement"). Reference is made to the Loan Agreement for a statement of the terms and conditions under which the loan evidenced by this Note is made.

The Borrower may prepay this Note, in part or in full, at any time and from time to time, without penalty or premium. Except as otherwise agreed in the Loan Agreement, payments received by the Lender from the Borrower on this Note shall be applied first to the payment of interest which is due and payable and only thereafter to the outstanding principal balance in the order of maturity. However, in the event of any prepayment of the principal balance of this Note, then the amount of each remaining installment due from the date of such prepayment through December 31, 2046 shall be recomputed, so that each such remaining installment shall be in an equal amount.

This Note evidences the obligation of the Borrower to repay a loan that it has taken out for the purpose of purchasing stock of the Lender for the benefit of the participants in the Lender's employee stock ownership plan (the "Plan"). Notwithstanding anything to the contrary stated above, the payments made pursuant to this Note during any fiscal year of the Plan shall not exceed an amount equal to (a) the sum of the contributions made by the Lender to the Plan during that year and during all prior years to enable the Borrower to meet its obligations under this Note, plus the earnings attributable to the investment of those contributions and the earnings attributable to the shares of stock of the Lender purchased with the proceeds of the loan evidenced by this Note, less (b) all

payments made by the Borrower under this Note in prior years. Such contributions and earnings thereon shall be accounted for separately on the books of the Plan until this Note is fully repaid.

This Note is secured by shares of the Lender's stock pursuant to a Stock Pledge Agreement, dated the date of this Note, and is without recourse against the Borrower, the Trustee of the Trust established under the Plan or the Plan.

Whenever in this Note there is reference made to the Lender or to the Borrower, that reference shall be deemed to include, as applicable, a reference to the respective successors and assigns of the Lender and of the Borrower.  The provisions of this Note shall be binding upon and shall inure to the benefit of the successors and assigns of the Lender and of the Borrower.

This Note has been signed, delivered, and accepted at San Diego, California and shall be interpreted in accordance with the laws of the State of Illinois.

[signature appears on the following page]

DB1/ 90457795.5

-2-

Roni Hicks & Associates Employee Stock Ownership Trust

TRUSTEE: First Bankers Trust Services, Inc., not in any individual capacity or in its corporate capacity, but solely as Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust

*First Bankers Trust Services, Inc.*

*Signature Page to ESOP Note*

# EXHIBIT A

## <u>Amortization Schedule</u>

See attached.

*Exhibit A*

## Roni Hicks Internal Loan

Compound Period ......... :  Annual

Nominal Annual Rate .... :  2.680 %

### CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 06/30/2017 | 6,448,978.00 | 1 | | |
| 2 | Payment | 12/31/2017 | Interest Only | 14 | Annual | 12/31/2030 |
| 3 | Payment | 12/31/2031 | 500,931.11 | 16 | Annual | 12/31/2046 |

### AMORTIZATION SCHEDULE - Normal Amortization

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| Loan   06/30/2017 | | | | 6,448,978.00 |
| 1   12/31/2017 | 87,126.58 | 87,126.58 | 0.00 | 6,448,978.00 |
| 2017 Totals | 87,126.58 | 87,126.58 | 0.00 | |
| 2   12/31/2018 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2018 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 3   12/31/2019 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2019 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 4   12/31/2020 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2020 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 5   12/31/2021 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2021 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 6   12/31/2022 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2022 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 7   12/31/2023 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2023 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 8   12/31/2024 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2024 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 9   12/31/2025 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2025 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 10   12/31/2026 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2026 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 11   12/31/2027 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2027 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 12   12/31/2028 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |

Roni Hicks Internal Loan

| Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|
| 2028 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 13   12/31/2029 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2029 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 14   12/31/2030 | 172,832.61 | 172,832.61 | 0.00 | 6,448,978.00 |
| 2030 Totals | 172,832.61 | 172,832.61 | 0.00 | |
| 15   12/31/2031 | 500,931.11 | 172,832.61 | 328,098.50 | 6,120,879.50 |
| 2031 Totals | 500,931.11 | 172,832.61 | 328,098.50 | |
| 16   12/31/2032 | 500,931.11 | 164,039.57 | 336,891.54 | 5,783,987.96 |
| 2032 Totals | 500,931.11 | 164,039.57 | 336,891.54 | |
| 17   12/31/2033 | 500,931.11 | 155,010.88 | 345,920.23 | 5,438,067.73 |
| 2033 Totals | 500,931.11 | 155,010.88 | 345,920.23 | |
| 18   12/31/2034 | 500,931.11 | 145,740.22 | 355,190.89 | 5,082,876.84 |
| 2034 Totals | 500,931.11 | 145,740.22 | 355,190.89 | |
| 19   12/31/2035 | 500,931.11 | 136,221.10 | 364,710.01 | 4,718,166.83 |
| 2035 Totals | 500,931.11 | 136,221.10 | 364,710.01 | |
| 20   12/31/2036 | 500,931.11 | 126,446.87 | 374,484.24 | 4,343,682.59 |
| 2036 Totals | 500,931.11 | 126,446.87 | 374,484.24 | |
| 21   12/31/2037 | 500,931.11 | 116,410.69 | 384,520.42 | 3,959,162.17 |
| 2037 Totals | 500,931.11 | 116,410.69 | 384,520.42 | |
| 22   12/31/2038 | 500,931.11 | 106,105.55 | 394,825.56 | 3,564,336.61 |
| 2038 Totals | 500,931.11 | 106,105.55 | 394,825.56 | |
| 23   12/31/2039 | 500,931.11 | 95,524.22 | 405,406.89 | 3,158,929.72 |
| 2039 Totals | 500,931.11 | 95,524.22 | 405,406.89 | |
| 24   12/31/2040 | 500,931.11 | 84,659.32 | 416,271.79 | 2,742,657.93 |
| 2040 Totals | 500,931.11 | 84,659.32 | 416,271.79 | |
| 25   12/31/2041 | 500,931.11 | 73,503.23 | 427,427.88 | 2,315,230.05 |
| 2041 Totals | 500,931.11 | 73,503.23 | 427,427.88 | |
| 26   12/31/2042 | 500,931.11 | 62,048.17 | 438,882.94 | 1,876,347.11 |
| 2042 Totals | 500,931.11 | 62,048.17 | 438,882.94 | |
| 27   12/31/2043 | 500,931.11 | 50,286.10 | 450,645.01 | 1,425,702.10 |
| 2043 Totals | 500,931.11 | 50,286.10 | 450,645.01 | |
| 28   12/31/2044 | 500,931.11 | 38,208.82 | 462,722.29 | 962,979.81 |
| 2044 Totals | 500,931.11 | 38,208.82 | 462,722.29 | |

Roni Hicks Internal Loan

| Date | Payment | Interest | Principal | Balance |
|------|---------|----------|-----------|---------|
| 29  12/31/2045 | 500,931.11 | 25,807.86 | 475,123.25 | 487,856.56 |
| 2045 Totals | 500,931.11 | 25,807.86 | 475,123.25 | |
| | | | | |
| 30  12/31/2046 | 500,931.11 | 13,074.55 | 487,856.56 | 0.00 |
| 2046 Totals | 500,931.11 | 13,074.55 | 487,856.56 | |
| | | | | |
| Grand Totals | 10,348,848.27 | 3,899,870.27 | 6,448,978.00 | |

# EXHIBIT E

# LAW OFFICE OF WILLIAM P. FENNELL
### A Professional Law Corporation

William P. Fennell *

_____
Of Counsel
Melissa A. Blackburn Joniaux
Charles F. Bethel

*Licensed in Colorado

600 West Broadway, Suite 930
San Diego, CA 92101
Tel: (619) 325-1560
Fax: (619) 325-1558
William.Fennell@fennelllaw.com

September 30, 2019

Howard J. Levine, Esq.
John A. Simon
**Drinker Biddle & Reath LLP**
191 North Wacker Drive, Suite 3700
Chicago, IL 60606-1698

Re:    Notification of Claims for Indemnity Under June 30, 2017 Stock Purchase Agreement as
Against Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and Steven F.
McCue

Gentlemen:

We are writing on behalf of our client, Integratedmarketing.com d/b/a Roni Hicks &
Associates, as debtor in the matter *In re Integratedmarketing.com*, So. Dist of CA. Bk Case No.
19-04688 ("Roni Hicks" or "the Company") for the purpose of notifying of claims arising out of
the March 13, 2014 and June 30, 2017 Stock Purchase Agreements (the "SPAs" collectively)
entered into between Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue and
Steven F. McCue (the "Sellers"), the Company and First Bankers Trust Services, Inc. ("FBTS") as
the Trustee of the Roni Hicks & Associates Employee Stock Ownership Trust ("Trust").  The
claims include, but are not limited to, those matters at issue in the Complaint filed on July 8, 2019
by First American Bank (the "Bank") as Case No. 1:19-cv-04594 in the United States District
Court Northern District of Illinois Eastern Division (the "Lawsuit") and to such additional claims
as enumerated below.

This letter is notification to the Sellers pursuant to Section 16(d) of the June 30, 2017 SPA
of the Company's claims (and to the extent applicable claims of the ESOP Trustee) for
indemnification against the Sellers commencing of the 90 day period to seek settlement of the
Company's (and the ESOP Trustee's) claims against the Sellers. If no satisfactory settlement is
reached the Company intends to proceed to arbitration pursuant to section 26.

Howard Levine
John A. Simon
September 30, 2019
Page 2

The Claim as stated herein arises out of the transactional documents executed by Jane Wheeler ("Ms. Wheeler") as President of the Company as well as the loan guaranties executed by Ms. Wheeler and Diane Gaynor ("Ms. Gaynor"). The purpose of the transaction evidenced by the June 30, 2017 documents was to provide financing for the sale of the stock from Ms. Wheeler and Ms. Gaynor to the Trust in June of 2017 ("the 2017 SPA").

In addition to the Bank providing financing for the sale of the stock from Ms. Wheeler and Ms. Gaynor, FBTS brokered the sale and Prairie Capital Advisors, Inc. ("Prairie") conducted an appraisal of the Company's value in order to set the sale price of Sellers' shares of stock in the Company, resulting in the Company's borrowing obligations to both the Bank and the Roni Hicks & Associates Employee Stock Ownership Plan ("ESOP") and to the Sellers.

As discussed herein, it is undisputed that the sale price for the purchase of the Sellers' stock was too high and this has resulted in an unrealistic imposition on the Company's cash flow, ultimately resulting in the filing for Chapter 11 protection. Some evidence that parties do not dispute these facts is that Sellers have tendered and Bank has accepted $2,000,000 (Sellers' guarantee) to the Roni Hicks' note to Bank, since the time the Company filed for bankruptcy.

Further, it is clear that prior to the closing of the 2017 SPA, there were clear indicia that the projections of future business made by the Sellers were grossly overstated resulting in the excess valuation of the stock and other problems which made the sale extremely imprudent from the position of the Company and the ESOP Trustee. These indicia and problems were known to the Sellers and should have been known by FBTS, Prairie, and the Bank and as a result, each of these parties bears some liability to the Company. However, the purpose of this letter is to notify Sellers of the Company's Claim for indemnity in a timely manner under section 16 of the 2017 SPA as amended in June 2019.

## I. THE ORIGIN OF THE BANK DEBT IN THE 2017 SPA TRANSACTION

Roni Hicks notes a factual outline of the 2017 SPA is laid out in ¶¶6-21 of the Declaration of Aaron Smith, DN 9-3, as filed with the bankruptcy case on August 8, 2019. Specifically, the Company made a note in favor of the Bank for $7,500,000 (along with a loan and security agreement) and the loan was supposed to be repaid at the rate of $89,285.21 in principal, along with interest, each month. The Sellers, for their part, executed guaranties to the Bank of the Company's indebtedness – $1,500,000 in Ms. Wheeler's case and $500,000 in Ms. Gaynor's. .

Section ¶16 of the 2017 SPA obligates the Sellers to indemnify the Company and the ESOP "for any loss, cost, expense, or other damage ... suffered by the Company or by the Trustee [ESOP] resulting from, arising out of, or incurred with respect to: (I) the falsity or the breach of any representation, warranty, or covenant made by the Sellers in this Agreement." Paragraph 6.5(b) of the same document attested the accuracy of the financial statements associated with the SPA.

Howard Levine
John A. Simon
September 30, 2019
Page 3

In addition to the indemnities, both the 2014 SPA (Section 25) and the 2017 (Section 27) required the Sellers to pay their own costs regarding the stock sales. Nevertheless, Roni Hicks paid Brookwood Vance (the Sellers' appraiser) $38,000 and it paid $443,000 in legal fees to Morgan, Lewis, Brockius for work which benefitted the Sellers far more than the Company. These amounts are owed to the Company by the Sellers as a direct claim.

## II.  THE STOCK PRICE WAS OVERVALUED, LEADING TO RONI HICKS TAKING ON FAR TOO MUCH DEBT

Before the ESOP could purchase the Sellers' shares in 2017, a price had to be set – the resulting per share valuation was supposed to reflect the going concern value of the Company. Prairie set this value by taking a completed business year's cash income and discounting the expected future receipts to reflect the uncertainties of the market in which Roni Hick operates. Prairie's resulting "enterprise value" appraisals showed the per share price of the stock in June 2017 should be $164.00. This number yielded, in turn, the total amounts the Sellers were to be paid for their shares and consequently the size of the loan the Company had to borrow from the Bank (as indicated above, $7,500,000). In addition to the obligation to the Bank the Sellers received promissory notes, respectively Wheeler $1,677,384.48 and McCue $558,886.51 as a result of the per share value stated by Prairie. This further adversely effecting the Company's finances.

It is notable that Prairie produced such appraisals (which ran into the many dozens of pages) for December 2016, June 2017 and December 2017. The Company was provided copies of the December 2016 and December 2017 appraisals, Prairie did not produce the full June 2017 appraisal to either the Company or the ESOP Trustee until recently following repeat demands made by the successor ESOP Trustee.

The evidence the 2017 SPA price was too high, along with the debt the Company took on, accumulated quickly after the SPA closed June 30, 2017. Notably, in six months, (June to December 2017) Prairie's price per share valuation had dropped from $164 to $1. Additionally, there was a peculiar quality in the hypothetical cash flow discounts Prairie had used to come up with the $164 per share figure (See pages 6-8 of Delgleish Power Point Exh. A).

Sellers were provided in March 2019 notice by the Company of the over valuation. That presentation was made by the then President Aaron Smith, Controller Janis Strockis, and Board Member J. Martin Dalgleish, supported by a power point presentation. A copy of that power point presentation is attached hereto as "Exhibit A" as created by Mr. Dalgleish, entitled "RHA The Way Forward Thoughts" consists of 17 slides, sets forth a discussion of valuation claims of the Company.

Howard Levine
John A. Simon
September 30, 2019
Page 4

At the time of the 2014 SPA, Prairie applied a 15.5% cash flow discount; when Prairie again valued the company in December 2016, it used a 16.5% discount. Nevertheless, six months later, at a time when the Company was taking on a very large amount of debt and changing over its entire management team, Prairie lowered the future cash flow discount to 15.5%, meaning the price per share estimate came out higher than it should have (and the estimate of the future hazards to the Company came out too low). As discussed below, there was additional information about adverse events before the 2017 SPA closed which should have led Prairie to a far more conservative valuation of the stock. There existed issues adversely effecting the future of the customer contracts that Sellers should have disclosed to all parties to the June 2017 transaction.

The over-valued loan has meant Roni Hicks made excessively high monthly payments to the Bank. This meant a loss of available cash the Company could otherwise have used to operate and promote its business operations. This meant the Company suffered in a continual cash poor condition and it meant the Company lost valuable customers as it has not been able to induce them to stay, a situation which started before the bankruptcy filing and has accelerated since seeking the protection of the Bankruptcy Court.

Simply put, if the share price had been lower and more reasonable, so too would the amount of the Bank loan. Roni Hicks' monthly borrowing and operating costs would have been lower, leaving more cash available for the Company's operating capital needs.

## III.  ADDITIONAL DAMAGES FROM THE 2017 SPA

Aside from the financial drag on the Company and the lost opportunities, the 2017 SPA and loan led to at least two further forms of damage. First, with respect to the per share value of the stock already owned by the ESOP and, second, regarding the Company's employee 401(k) plan.

As all the parties are aware, the Sellers transferred the first 49% of their shares in Roni Hicks to the ESOP through a Stock Purchase Agreement in 2014. Logically, if the remaining 51% of the stock had a value of $164 per share in June 2017, so too did the shares already held by the ESOP. As indicated above, the Company believes $164 per share was too high – but the shares already held by the ESOP had some value before the 2017 SPA. Because the 2017 SPA led to the taking on of extremely high debt to the Bank, the sale of the 51% of the Sellers' shares led directly to making the Company insolvent with the result the original 49% of shares became effectively valueless within six months.

As for the 401(k), the Bank is the administrator of this plan. It had been the Company's practice each year to make an employer contribution of 6% of the employee salaries to the 401(k). Nevertheless, toward the end of the 2018 calendar year, when the Company's financial distress from the 2017 SPA had become apparent, the Bank intervened with the management, as both lender and 401(k) administrator, declaring it would not permit the Company to make the 2018

Howard Levine
John A. Simon
September 30, 2019
Page 5

401(k) contribution.  As explained above with respect to poor cash flow in general, this failure to
make the 401(k) contribution put Roni Hicks at risk of losing and/or maintaining valuable and
talented employees.

## IV.  THE INDICATORS REGARDING OVERVALUATION IN THE 2017 SPA

Roni Hicks believes it is clear the Sellers, the Bank, FBTC and Prairie knew, or should
have known before the 2017 sale closed, that the stock price was too high, meaning the
acquisition loan from the Bank was too high and the Company would be unable to sustain
payments on that loan and/or remain within the stated debt ratio.  The indicators in question fell
into two areas:  First, the Sellers knew about the impending loss of the Company's key client
before the 2017 SPA.  Second, the transaction included self-dealing by the Sellers (known to the
Bank, FBTC and Prairie) and a number of peculiarities uncommon in a sale and loan deal of the
type and size of the SPA.  The Company asserts that Sellers actions are breaches of warranties
provided and numerated in section 6.5(a) and (b) and 6.6.  Company holds direct claims against
the Sellers and seeks indemnity for claims asserted by the Bank and others against the Company.

### A.  Loss of Newland Business

Prior to 2017, 60 to 65% of Roni Hicks' sales each year came from its largest marketing
customer, Newland Communities (and leader in it's industry that other customers follow).  Those
sales came from the Company's longstanding working relationship with Newland's chief
marketing officer, Teri Slavic-Tsuyuki.  However, in early 2017, Newland terminated Ms. Slavic-
Tsuyuki's employment and the remaining Newland management began canceling contracts with
Roni Hicks.  These were facts know to Sellers before June 30, 2017.

It does not matter why Newland elected to sever Ms. Slavic-Tsuyuki's employment or why
it began cancelling its Roni Hicks contracts.  What matters is that several months before the 2017
SPA closed, the Sellers, who were still in control of Roni Hicks' operations, knew the existing
Newland business was being withdrawn and the likelihood of the Company getting future
contracts from Newland was very unlikely to occur.

Especially problematic for the Sellers on the Newland point is ¶6.11 of the 2017 SPA
stated there had been no contract cancellations by any of the Company's clients.  Ms. Wheeler
signed this document on Roni Hicks' behalf as its president.

The Company believes the Sellers failed to inform Prairie (as the appraiser), FBTC (as the
broker) and the Bank (as lender) before the 2017 SPA closed that it was already on the way to
losing upwards of sixty percent of its income base.  To the extent Prairie, FBTC or the Bank (or
individual officers of the Bank) did know about the loss of Newland, it is self-apparent each of
them acted wrongfully by not postponing the sale and requiring a reappraisal/new evaluation.  But

Howard Levine
John A. Simon
September 30, 2019
Page 6

in any event, the Company, Roni Hicks also believes if these parties did not know, that Prairie, FBTC, and the Bank would have been able to have learned the relevant information if they had performed a due and diligent inquiry.

### B. Self-Dealing and Lax Appraisal, Brokerage, and Lending Practices

The Sellers' self-dealing took several forms, each of them known or knowable to Prairie, FBTC and the Bank at the time of accelerated payment of 2014 acquisition loan:

- The Sellers had, of course, pledged securities accounts they had at TD Ameritrade to secure the Bank's acquisition loan to Roni Hicks with respect to the 2014 SPA of the first 49% of shares. That loan had been for $5,500,000 and the full term of the note ran from 2014 to 2019.

- Under the Sellers' direction, the Company used significant amounts of its cash flow in 2015, 2016, and the first half of 2017, to accelerate the pay off of the 2014 acquisition loan. Notably, between December 2016 and June 2017, the Sellers caused the Company to pay out $1,500,000 to the Bank on the 2014 loan.

- The accelerated payment of the 2014 loan was, of course, known to the Bank and it would have been known to FBTC and Prairie through a diligent inquiry as it was reflected in Roni Hicks' financial reports.

- The accelerated pay down of the 2014 loan debilitated Roni Hicks by draining vital cash reserves stunting the growth and development of business operations while directly benefitting the Sellers by allowing Sellers to obtain releases of the Bank's liens against their TD Ameritrade accounts and by creating a false appearance of financial strength of Roni Hicks Operations.

To the extent Company is liable to Bank, Company asserts it is entitle to indemnity of Sellers resulting from their action of financial benefits each received above.

### C. Ms. Wheeler Acted for Her Own Benefit at the Time She Was an Officer of the Company

Ms. Wheeler executed the 2017 stock purchase agreement on her own behalf as seller and on Roni Hicks' behalf as its CEO. Ms. Wheeler likewise signed the June 30, 2017 loan and security agreement and the promissory note in favor of the Bank on behalf of Roni Hicks as its CEO. Of further note, Ms. Wheeler's adult daughter (who was otherwise unconnected to the Company operations) had been appointed to sit on the Company's board of directors and she voted in favor of the 2017 SPA when it was presented to the Board.

Howard Levine
John A. Simon
September 30, 2019
Page 7

These actions by Ms. Wheeler were, again, known to or knowable by Prairie, FBTC and the Bank, and as result Company is entitle to indemnify from Sellers for claims of the Bank.

### D. Laxity in appraisal, brokerage and banking

The Company submits it is self-apparent Prairie, FBTC, and the Bank did not do adequate inquiries into the Company's books and business based on all the foregoing.

The Bank did not act in accordance with generally accepted risk standards in making the 2017 acquisition loan and Sellers actions leading up to the lending event contributed over to encumbering of the Company. It's the Company's position that Sellers engaged in a course of conduct, including breaching expressed warranties set forth in paragraphs 5, 6.3 (c) and 6.11 of the 2017 SPA which resulted in an over valuation of the stock and resulting in loan obligation to Bank, which the Company has been unable to service.

Specifically, the Bank lent $7,500,000 (and an additional $350,000 in a revolving credit line) in 2017 but only required $2,000,000 worth of guaranties from the Sellers. [The Bank was (and is) unsecured as to the remaining $5,500,000 – the collateral the Bank did obtain from the Company consists of what evanescent assets such as accounts receivable, as opposed to more typically solid business assets such as patents, copyrights, software licenses, or manufacturing equipment or real estate (Roni Hicks does not, of course, own any of these more tangible assets).

## V. THE ERISA PROBLEM

We will discuss the liabilities the Sellers, et al. may have in more detail below. But on the matter of the mis-valuation of the shares sold in the 2017 SPA, we simply note that even without any intentional wrongdoing, the stock undervaluation by itself may have been an ERISA violation, subjecting the whole transaction to being overturned on that basis.

## VI. ABSENT SETTLEMENT, RONI HICKS EXPECTS TO LITIGATE ITS CLAIMS AGAINST THE SEVERAL PARTIES

We believe Roni Hicks has claims against the Sellers, counter-claims against the Bank and third party claims against, FBTC and Prairie. If the Company is required to file claims before an arbitrator (or in one or more adversary proceedings in the San Diego Bankruptcy proceeding of the Company), those claims will be made:

Claims against Ms. Wheeler and Ms. Gaynor exist under the indemnity clauses of the 2017 SPA in an amount not less than $6,300,000 made pursuant to ¶16(b)(ii) of the 2017 SPA.

Howard Levine
John A. Simon
September 30, 2019
Page 8

Further claims against Ms. Wheeler will be made for breach of fiduciary duty for:

1.    failing to disclose the loss of the Newland account prior to closing of the
2017 SPA;

2.    the paying down the 2014 SPA too quickly in Spring 2017 (which was not
in the Company's best interest as set forth above);

3.    Sellers self-dealing in execution of the 2017 SPA documents; and

4.    and for continued self-dealing as a member of the Board of Directors for
the period early 2017 to August 2019.

Additional claims to be made in an arbitration (or to be filed as an adversary complaint) against Sellers for indemnity, will be made as claims are pursued against FBTC and Prairie and Bank under the ERISA standards for failing to do an adequate appraisal of the Company's value before the closing of the 2017 SPA and ignoring the Sellers' obvious conflicts of interest in the sale transaction.

We are aware from the Complaint of the Bank, it contends Roni Hicks holds no claims or defenses based on the supposed waiver in the March 2019 forbearance agreement. Without going into the merits of this question at present, suffices it to say Roni Hicks disagrees; and so Sellers are on notice.

## VII.  A SETTLEMENT PROPOSAL

1.    Roni Hicks' loan obligation on the 2017 SPA will be lowered from the $6,865,627.26 stated in the Bank's July 8, 2019 complaint to $2,000,000 and this lowered amount will not be augmented by any of the unpaid interest, fees, or legal costs (including attorney's fees) complained of by the Bank.

2.    It will be up to the Bank, Ms. Wheeler, Ms. Gaynor, FBTC and Prairie to apportion the remaining $4,965,627.26 (and the attendant interest, fees, and legal costs) among themselves.

3.    In exchange for the debt reduction, Roni Hicks will release the indemnity and direct claims it holds against the Sellers and the other claims it may hold against the Bank, FBTC and Prairie.

In the event a satisfactory resolution cannot be reached, the Company intends to proceed defending itself in the Chicago District Court case, part of which will entail counter-claims against the Bank and third party claims against the Sellers, FBTC and Prairie and arbitrating claims as set forth herein.

Howard Levine
John A. Simon
September 30, 2019
Page 9


    We believe we have laid out colorable claims and defenses with respect to the Sellers, the Bank, FBTC and Prairie.

    We therefore hope this letter will receive your careful consideration and that Sellers will reconsider your resistance to the idea of settlement these disputes.

                              Sincerely,
                              LAW OFFICE OF WILLIAM P. FENNELL, APLC

                              /s/William P. Fennell

                              William P. Fennell


WPF/cfb
cc:

| TO THE SELLERS: | TO THE TRUSTEE |
|---|---|

Larry A. Goldberg, Esq.
**ESOP Law Group**
244 California Street, Suite 300
San Francisco, CA 94111

Jane Carey Wheeler and Stephen
W. Wheeler
1206 Caminito Graciela
Encinitas, CA 92024

First Bankers Trust Services, Inc.
2321 Kochs Lane
Quincy, Illinois 62305-4005
Attention: RHA AccountOfficer

Prudent Fiduciary Services, LLC
100 N. Barranca St., Suite 870
West Covina, CA 91791
Attention: Miguel Paredes

Diane L. Gaynor-McCue and
Steven F. McCue
2901 Amigo Drive
Lake Havasu City, Arizona 86404

Schatz Brown Glassman LLP
1007 Farmington Avenue – Suite 4
West Hartford, CT 06107
Attention: Robert Schatz

First Bankers Trust Services, Inc.
2321 Kochs Lane
Quincy, Illinois 62305-4005
Attention: Roni Hicks & Associates
Account
Officer

Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, Illinois 60601
Attention: Brian Hector



# PRUDENT FIDUCIARY
### —— S E R V I C E S ——

September 30, 2019

**<u>Via Email & FedEx</u>**

Jane Carey Wheeler
Stephen W. Wheeler
Diane L. Gaynor-McCue
Steven F. McCue
c/o Howard Levine
Drinker Biddle & Reath LLP
191 N. Wacker Dr., Ste. 3700
Chicago, IL 60606

Jane Carey Wheeler
Stephen W. Wheeler
1206 Caminito Graciela
Encinitas, CA 92024

Diane L. Gaynor-McCue
Steven F. McCue
2901 Amigo Dr.
Lake Havasu City, AZ 86404

> RE:    Roni Hicks & Associates Employee Stock Ownership Plan
>        Trustee's Written Notice to Assert Right of Indemnification

Dear Ms. Wheeler, Mr. Wheeler, Ms. Gaynor-McCue, and Mr. McCue:

I, Miguel Paredes, am the current and successor trustee (the "Trustee") of the Roni Hicks & Associates Employee Stock Ownership Trust (the "Trust"), which forms part of the Roni Hicks & Associates Employee Stock Ownership Plan (the "Plan" or "ESOP").

This letter serves as written notice of my assertion of an indemnification claim made as of September 30, 2019, as the ESOP's Trustee and on behalf of the ESOP and its participants and beneficiaries, against Jane Carey Wheeler, Stephen W. Wheeler, Diane L. Gaynor-McCue, and Steven F. McCue (the "Sellers"), pursuant to the Stock Purchase Agreement dated June 30, 2017 by and among the Sellers, IntegratedMarketing.com d/b/a Roni Hicks & Associates (the "Company"), and First Bankers Trust Services, Inc., the predecessor trustee of the Trust (the "Predecessor Trustee"), as well as Amendment No. 1 to the Stock Purchase Agreement dated June 21, 2019 executed by the Sellers, the Company, and me, in my capacity as the successor trustee of the Trust (together, the "Stock Purchase Agreement").

After reviewing the circumstances surrounding the June 30, 2017 purchase of Company stock by the ESOP (the "2017 ESOP Transaction"), I have determined that the following representations,

---

warranties, and/or covenants contained in the Stock Purchase Agreement were breached on the part of the Sellers:

- Section 6.6: "Interim Operations. Except for agreements entered into and liabilities incurred in connection with the establishment of the Plan and the financing of the purchase and sale of the Shares contemplated by this Agreement, since December 31, 2016: (a) the business of the Company has been carried on in the usual course; (b) there has been no material adverse change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company; and (c) there has been no other material change in the financial condition, results of operations, assets, liabilities, business, or prospects of the Company, except in the ordinary course of business."

- Section 6.11: "Contracts. All of the contracts to which the Company is a party (the "Contracts") are valid, binding, and enforceable according to their terms; there is no default or event that with notice or lapse of time, or both, would constitute a default by any party to any of the Contracts; the Company has not received any notice that any party to any of the Contracts intends to cancel or terminate any of the Contracts; and the Company is not a party to or bound by any agreement that is materially adverse to the business or financial condition of the Company."

- Section 6.21: "Pre- and post-Transaction Solvency. The Company is and, after giving effect to the transactions contemplated by this Agreement, the Company's making of the ESOP and Seller Loans to the Trustee to enable the Trustee to purchase the Shares and the Company's receipt of loans from First American Bank for the purpose of, among others, funding the ESOP Loan, referred to herein as the "transactions contemplated by this Agreement"), will be: (a) in compliance with the requirements of Sections 500-509 of the California Corporations Code based on the most recent financial statements available to the Sellers at the time of Closing Date, (b) the Company's working capital is adequate to meet its current and projected obligations to creditors as and when they become due; and (c) the Company will not be left with an unreasonably small amount of capital with which to meet its obligations."

- Section 6.22: "Disclosure. None of the representations or warranties made by the Sellers in this Agreement, and none of the statements made in the Disclosure Schedule or any document furnished pursuant to this Agreement, contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not misleading."

After examining the 2017 ESOP Transaction, which included reviewing information and documentation relating to the transaction and conducting interviews with several of the principal parties involved in the transaction, I have determined that certain information was not appropriately and/or sufficiently disclosed by the Sellers to the Predecessor Trustee relating to the status of one of the Company's key clients, Newland Communities, and the Company's financial outlook as a result of the change in this client's status. Based on my review of the 2017 ESOP Transaction, I have determined that the information that was not disclosed appropriately and/or sufficiently was known and/or knowable at the time of the 2017 ESOP Transaction.

2

Moreover, such information concerned a material adverse change in the financial condition and prospects of the Company; involved a party to a Company contract and its intent to cancel or terminate its contract; would have indicated an issue with the Company's post-transaction solvency based on the Stock Purchase Agreement terms as executed; and involved material facts necessary to support the terms of the Stock Purchase Agreement as executed.

As Trustee, I have determined that due in significant part to the Sellers' breaches of the aforementioned representations, warranties, and/or covenants in the Stock Purchase Agreement, the 2017 ESOP Transaction was based on an overstatement of value of the Company, which resulted in the ESOP paying more than fair market value for the stock. This loss to the ESOP has been calculated by the Trustee to be between $4,236,000 and $4,447,000.

As Trustee, I acknowledge that this claim shall be resolved pursuant to the procedures outlined in the Stock Purchase Agreement in Sections 16(d) and 25, and any other relevant sections.

Please contact me if you would like to further discuss this matter.

Sincerely,

Miguel Paredes, not in his individual or corporate capacity, but solely in his capacity as Trustee of the Roni Hicks & Associates Employee Stock Ownership Plan and associated Trust

Cc:     Morgan, Lewis & Bockius LLP
        77 West Wacker Drive
        Chicago, IL 60601
        Attention: Brian Hector

3